**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALBERT L. GLOVER, individually and on behalf of all others similarly situated, ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) | No. 2:03-CV-0288 |
| ) | |
| ANTHONY J. DeLUCA, HARRY J. SOOSE, FRANCIS J. HARVEY, JAMES C. McGILL, RICHARD W. POGUE, DANIEL A. D'ANIELLO, PHILIP B. DOLAN, E. MARTIN GIBSON, ROBERT F. PUGLIESE, JAMES DAVID WATKINS, and THE CARLYLE GROUP, ) ) ) ) ) ) ) ) | CLASS ACTION Judge Thomas M. Hardiman |
| ) | |
| Defendants ) | |

**OPINION**

This securities class action arises out of the collapse of a Pittsburgh company known as the IT Group, Inc. (ITG or Company). This Court recently entered an opinion in a companion case, *Payne v. DeLuca*, CA 02-1927, dismissing with prejudice the Second Amended Complaint (SAC.) In almost every regard, the *Payne* and *Glover* cases are identical, the only major differences being the class periods and some allegations regarding misrepresentations and scienter. Because this Opinion assumes familiarity with the opinion entered in *Payne*, 433 F. Supp.2d at 547 (W.D. Pa. 2006), the Court will focus on the substantive differences between the two cases, although many of the operative facts are the same.

## I.    INTRODUCTION

### A.    Factual History[1]

IT Group was a Delaware corporation headquartered in Monroeville, Pennsylvania, whose primary business was providing environmental remediation services to commercial customers and federal government agencies.  Beginning in November 1996, Defendant The Carlyle Group (Carlyle), a private merchant bank located in Washington, D.C., invested some $45 million in ITG, acquiring more than 46,000 shares of convertible preferred stock and 1.2 million shares of common stock, giving it approximately 25% of the voting power of the Company.

By virtue of its position as principal holder of the convertible preferred stock, Carlyle had the right to elect one fewer than the majority of directors.  Carlyle was thereby able to install one of its managing directors, Daniel D'Aniello, as Company Chairman, and named four other members of the ITG Board of Directors:  Philip Dolan, Martin Gibson, Robert F. Pugliese, and James David Watkins.  Francis J. Harvey, who was named to the Board in May 1999, had no formal affiliation with Carlyle, but served on two other boards of Carlyle-controlled companies and on the ITG Board "at Carlyle's behest."  Other directors were James C. McGill and Richard W. Pogue.  Anthony J. DeLuca served as President and Chief Executive Officer (CEO); Harry J. Soose was Senior Vice President and Chief Financial Officer.[2]

Soon after Carlyle took control of the Company, ITG embarked on an aggressive plan of growth and diversification through acquisition.  Between 1997 and May 2000, ITG acquired eleven domestic and international companies which it financed by taking on some $645 million in new debt; this included issuing $225 million of ten-year senior subordinated notes in 1999.  One of the

---

[1]  Unless otherwise noted, the facts in this section are taken from Plaintiff's Amended Class Action Complaint.  For additional detail, *see Payne*, 433 F. Supp.2d at 553-555.

[2]  Collectively, Messrs. DeLuca, Soose, Harvey, McGill, Pogue, D'Aniello, Dolan, Gibson, Pugliese and Watkins will be referred to as the "Individual Defendants."  Further details about each Defendant's position and history with ITG are provided in *Payne*, 433 F. Supp.2d at 563-564.

most significant acquisitions was that of OHM Corporation in 1998.

The acquisitions and diversification increased ITG revenues from $400 million in 1996 to approximately $1.4 billion in 2000. By the Spring of 2000, however, the Board of Directors realized that the Company's strategy had failed for a number of reasons, including: insufficient revenue to offset the debt incurred as a result of the acquisitions; difficulty managing the diversity of the acquired companies; loss of key personnel; failure of acquired entities to perform as well as expected; failure to realize the expected cost-savings from consolidation, in part because of poor management; and the general economic slowdown of the late 1990s.[3]

The Board of Directors re-focused its attention on debt reduction, recognizing that the Company was having increased difficulty meeting the financial covenants of its bank loans. Even though ITG had announced that it intended to pay down its outstanding debt by $100 million in 2000, on March 8, 2000, ITG obtained an additional $100 million, seven-year term loan (the Term C Loan) in an attempt to resolve its liquidity problems. Although described as a means to support seasonal working capital requirements, Plaintiff alleges that the Term C Loan was merely a temporary solution to the Company's massive liquidity problems which Defendants concealed from investors.

Despite the burgeoning liquidity crisis, ITG maintained a public relations campaign designed to reassure the investing public about the Company's stability and bright future. At the same time, a number of allegedly deceptive accounting and managerial practices (discussed in more detail *infra*) were implemented at the direction of Defendants DeLuca and Soose. By September 2001,

---

[3] The Amended Complaint provides several additional reasons for the failure of ITG. Those allegations are derived from other complaints pending against the Company and against the Individual Defendants, including: that Carlyle "embarked on an acquisition and debt binge, buying companies for amounts far in excess of their fair value;" and that an unidentified "they" made transfers "for the benefit of insiders, artificially extending the life of the insolvent company to obtain a return on the Carlyle Defendants' equity investment." (AC, ¶¶ 99-100). Since such allegations are not factually supported elsewhere in the AC, they have not been considered in the Court's analysis.

3

the Company's line of credit was almost depleted and it was having difficulty meeting its loan covenants. As a result, it was forced to renegotiate the terms of its loans.

On November 13, 2001, Defendant DeLuca announced his resignation as President and CEO; he was replaced by Defendant Harvey. According to Plaintiff, Harvey had actually become DeLuca's *de facto* superior at the May 2001 Board of Directors meeting when he was named Vice Chairman of ITG. Plaintiff claims that Carlyle required DeLuca's ouster "due to the [Company's] severe financial situation." (AC, ¶¶ 92, 108).

By December 7, 2001, even the questionable accounting practices instituted by DeLuca and Soose were not sufficient to keep ITG afloat and it was forced to admit to its lenders that without an emergency loan of $35 million, it would be bankrupt within the month. The lenders refused to loan more money and Carlyle refused to invest additional funds. Although ITG immediately retained workout and restructuring specialists, the Company acknowledged at a second meeting with the banks on December 18, 2001, that its liquidity and leverage problems prevented it from obtaining new contracts with its largest customer, the federal government. On December 27, 2001, the Company publicly announced to investors that a bankruptcy filing could be expected. On January 16, 2002, just three weeks later, ITG filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code.

### B.     Procedural History

Howard G. Clair, Ralph S. Weaver, and Carol S. Pintek (the Clair Plaintiffs) filed suit on February 27, 2003, alleging that (1) Defendants breached their fiduciary duty to investors by making false and misleading statements;[4] (2) the Individual Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the 1934 Act), 15 U.S.C. §§78j(b) and 78(n) and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by preparing and issuing public statements

---

[4]  This claim was deleted from the Amended Complaint.

4

containing misrepresentations and omissions which induced the Clair Plaintiffs and members of

the Class to purchase IT common stock at artificially inflated prices, and (3) Defendants caused

the Company to engage in the illegal conduct and practices described above inasmuch as they

were "controlling persons" of IT Group as that term is defined in Section 20(a) of the Act, 15 U.S.C.

§78t(a).  The Clair Plaintiffs brought suit on "behalf of all other persons or entities who purchased

or acquired [ITG] common stock during the Class Period and were damaged thereby."[5]  (Complaint,

¶ 50.)  The Class Period was defined as October 21, 1998, through February 23, 2000.  In light of

the Third Circuit's decision in *Lieberman v. Cambridge Partners, LLC,* 432 F.3d 482, 492 (3d Cir.

2005), discussed in the margin,[6] the Class Period is now defined as July 30, 1999, through

---

[5]  This definition was modified in the Amended Complaint to include all "public investors who purchased IT Group securities, including the $225,000,000 debt offering of October 1999," during the Class Period.

[6]  Defendants argue that following the Third Circuit's decision in *Lieberman*, the Class Period herein may not begin prior to July 30, 1999.  Plaintiff apparently concedes this point, both by failing to offer any argument in his brief in opposition to the motion to dismiss and by a footnote in the Amended Complaint itself, recognizing that the Class Period may be limited by *Lieberman*.  (AC at 1, n1.)

The Supreme Court held in 1991 that the period in which a plaintiff could bring a securities fraud action under Section 10(b) was one year "after the discovery of the facts constituting the violation and within three years after such violation."  *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364 (1991).  While the plaintiff was entitled to the longer period in cases of fraudulent concealment, the Court held that "[b]ecause the purpose of the 3-year limitation is clearly to serve as a cutoff, we hold that tolling principles do not apply to that period."  *Id.,* 501 U.S. at 363.  On July 30, 2002, Congress enacted the Public Company Accounting and Investor Protection Act of 2002, otherwise known as the Sarbanes-Oxley Act, PL Pub. L. No. 107-204, 116 Stat. 745 (2002).  Section 804 of the Act, codified at 28 U.S.C. §1658(b), extended the time for bringing a private securities fraud action from the periods set out in *Lampf* to two and five-years, respectively.  When the Clair Plaintiffs filed suit in February 2003, there was no consensus among the circuit courts as to the effect the extended periods might have on claims which otherwise would have been extinguished under *Lampf*.

On December 27, 2005, the Third Circuit Court of Appeals concluded – as had the other three circuit courts of appeals and lower courts in this Circuit which had considered the question -- that extending the amended statute of limitations to revive expired securities fraud claims would have an impermissible retroactive effect.  *Lieberman,* 432 F.3d at 492, *citing Landgraf v. USI Film Products,* 511 U.S. 244, 265 (1994) for the principle that "the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal."  In short, the Third Circuit held that Section 804 could not be used to revive claims which were time-barred as of July 30, 2002, regardless of whether the case pursuing those claims was filed before or after that date.  *See also In re Enterprise Mortgage Acceptance Co., LLC, Sec. Litig.,* 391 F.3d 401, 409-410 (2d Cir. 2004); *Foss v. Bear, Stearns & Co.,* 394 F.3d 540, 542 (7th Cir. 2005); *In re ADC Telecoms. Inc. Sec. Litig.,* 409 F.3d 974, 978 (8th Cir. 2005); *In re Exxon Mobil Corp. Sec. Litig.,* 387 F. Supp.2d 407, 416 (D. N.J. 2005) (Wolfson, J.); *In re Interpool, Inc. Sec. Litig.,* CA No. 04-321, 2005 U.S. Dist. LEXIS 18112, *60, n11 (D. N.J. Aug. 17, 2005) (Chesler, J.); and *Lieberman v. Cambridge Partners, LLC,* CA 03-2317, 2004 U.S.

February 23, 2000.

After three attempts at publishing the notice of the pending private securities class action and otherwise satisfying the criteria of the 1934 Act, as amended by the Private Securities Litigation Reform Act of 1995 (the Reform Act or PSLRA), Albert L. Glover was appointed Lead Plaintiff on January 25, 2006.  At a status conference held on March 24, 2006, counsel for Plaintiff advised the Court that they intended to file an amended complaint in this matter and were ordered to do so by March 31, 2006.   Defendants responded on April 7, 2006, with the pending Motion to Dismiss.

       C.    Jurisdiction and Venue

This Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1337, Section 27 of the Securities Exchange Act of 1934.  Venue is appropriate in this District pursuant to 15 U.S.C. §78aa  and 28 U.S.C. §1391(b) because many of the acts giving rise to the violations alleged herein occurred in this District.

## II.  STANDARD OF REVIEW – MOTION TO DISMISS

As explained in more detail in *Payne,*[7] a securities fraud action brought under the Reform Act is subject to three levels of scrutiny:   the standard requirements of Federal Rule of Civil Procedure 12(b)(6), which requires the court to "accept all well-pleaded allegations in the complaint as true and to draw all reasonable inferences in favor of the non-moving party,"[8] the requirement

---

Dist. LEXIS 11553, *9-*10 (E.D. Pa. June 21, 2004) (Rufe, J.)

[7]  *See Payne,* 433 F. Supp.2d at 556-557.

[8]  Plaintiff argues that in considering a motion to dismiss, the Court may not weigh competing inferences except with regard to allegations of scienter.  He further claims that *In re Alpharma Sec. Litig.*, 372 F.3d 137, 150 (3d Cir. 2004), stands for the proposition that "all inferences are to favor the plaintiff with respect to scienter allegations."  (Plf.'s Memo at 6, n.13.)  This is a misstatement not only of the holding of *In re Alpharma*, but of the law in general.  Controlling law in this Circuit establishes that in considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court is to draw all **reasonable** inferences in favor of the plaintiff.  *In re Suprema Specialties*, *Inc. Sec. Litig.*, 438 F.3d 256, 281 (3d Cir. 2006) (emphasis added).  *See also Benak v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 399 (3d Cir. 2006).  Moreover, the Court of Appeals in *In re Alpharma* explicitly did not hold that all scienter

of Federal Rule of Civil Procedure 9(b), requiring that "in all averments of fraud, . . . the circumstances constituting fraud . . . shall be stated with particularity," and the requirement of the Reform Act that "the complaint shall, with respect to each act or omission alleged to violate this title, . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *See In re Rockefeller Ctr. Props., Inc. Secs. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417-1418 (3d Cir. 1997); and 15 U.S.C. §78u-4(b)(2). The heightened requirements of the Reform Act apply most rigorously to Plaintiff's claims regarding the mental state of each Defendant. That is, although Rule 9(b) allows malice, intent, knowledge, and other mental states to be averred generally in suits claiming fraud, the Reform Act requires more than vague or unspecific allegations concerning each Defendant's state of mind at the time in question. *In re Rockefeller Ctr.*, 311 F.3d at 216 and n.15. Heightened particularity also applies to statements which are alleged to have been misleading or false, requiring Plaintiff to state with regard to each such statement "the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1). "If a complaint fails to comply with the PSLRA's pleading requirements, dismissal is mandatory." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004), *citing* 15 U.S.C. §78u-4(b)(3)(A).

As a general matter under Rule 12(b)(6), a court may not consider documents extraneous to the pleadings without treating the motion as one for summary judgment and giving all parties reasonable opportunity to present materials pertinent to such a motion under Rule 56. An exception is made, however, for a "document integral to or explicitly relied upon in the complaint,"

---

inferences are to favor the plaintiff but, to the contrary, "inferences of scienter do not survive if they are merely reasonable. Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and strong inferences." *In re Alpharma Sec. Litig.*, 372 F.3d at 150 (internal quotation and citation omitted).

and it has been long established that "a court may consider an undisputedly authentic document

that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on

the document." *In re Burlington*, 114 F.3d at 1426 (internal citations omitted). In securities fraud

actions, it is equally well-established that a court may consider public documents filed with the

SEC.[9] *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000).

## III. COUNT I – VIOLATION OF SECTION 10(b) OF THE 1934 ACT

### A. Applicable Law

In Count I of the Amended Complaint, Plaintiff claims that each Individual

Defendant[10] violated Section 10(b) of the 1934 Act. In particular, Plaintiff alleges:

> At all relevant times, the Defendants, individually and in concert, directly and
> indirectly, . . . engaged and participated in a continuous course of conduct whereby
> they knowingly and/or recklessly made and/or failed to correct public
> representations which were or had become materially false and misleading
> regarding [ITG's] financial results and operations. This continuous course of
> conduct resulted in the Defendants causing [ITG] to publish public statements which
> they knew, or were reckless in not knowing, were materially false and misleading,
> in order to artificially inflate the market price of [ITG] stock and which operated as
> a fraud and deceit upon the members of the Class.

---

[9] As a public entity trading on the New York Stock Exchange, ITG was required to file quarterly
and annual reports with the Securities and Exchange Commission. Under Sections 13(a) and 15(d) of the
1934 Act, any company offering registered securities must file a comprehensive annual report with the
SEC on Form 10-K within 90 days of the close of the company's fiscal year. 15 U.S.C. §78m; 17 C.F.R.
§240.13a-1. Similarly, a quarterly report must be filed on Form 10-Q within 45 days after each of the
company's first three fiscal quarters. 17 C.F.R. §§240.13a-13. The Company filed the required Form S-4
in connection with the OHM merger in 1998 and Form S-4/A when it implemented the exchange offer for
$225 million of senior subordinated notes in September 1999. *See* 17 C.F.R. §230.145, reclassification of
securities, mergers, consolidations and acquisitions of assets.

[10] In his supplemental brief in opposition to the motion to dismiss Count II of the Amended
Complaint, Plaintiff argues that Carlyle is also culpable under Count I. However, it is clear from the face of
the Amended Complaint that Plaintiff did not advise Defendants that Carlyle was also to be considered
liable under Count I. (*See* AC, Count I heading preceding ¶ 477, explicitly excluding Carlyle.) Therefore,
the Court has disregarded Plaintiff's arguments implying that Carlyle is to be included as a Defendant in
those allegations related to Count I. It is well-established that a plaintiff may not amend the complaint
through statements contained in a brief in opposition to a motion to dismiss. *P. Schoenfeld Asset Mgmt.
LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 613-614 (D. N.J. 2001), *citing Pennsylvania ex rel.
Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988).

The Individual Defendants are liable as direct participants in and as a controlling persons [sic] of the wrongs complained herein. By virtue of their positions of control and authority as officers and directors of [ITG] the Individual Defendants were able to and did, directly or indirectly, control the content of the aforesaid statements relating to the Company, and/or the failure [sic] to correct those statements in timely fashion once they knew or were reckless in not knowing that those statements were no longer true or accurate. The Individual Defendants caused or controlled the preparation and/or issuance of public statements and the failure to correct such public statements containing misstatements and omissions of material facts as alleged herein.

(AC, ¶¶ 478-479).

Section 10(b) of the 1934 Act makes it unlawful "to use or employ, in connection with the

purchase or sale of any security registered on a national securities exchange . . . any manipulative

or deceptive device or contrivance in contravention of such rules and regulations as the

Commission may prescribe as necessary or appropriate in the public interest or for the protection

of investors." 15 U.S.C. §78j(b). Among the rules and regulations promulgated under Section

10(b), Rule 10b-5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a)     To employ any device, scheme, or artifice to defraud . . .

(b)     To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)     To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. §240.10b-5.

In a securities fraud action brought pursuant to Section 10(b) and Rule 10b-5, the basic

elements to be alleged by a plaintiff are: (1) a material misrepresentation or omission by the

defendant; (2) scienter; (3) in connection with the purchase or sale of a security; (4) reliance, often

9

referred to in fraud-on-the-market cases as "transaction causation;"[11] (5) economic loss; and (6) "loss causation, i.e., a causal connection between the material misrepresentation and the loss." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-342 (2005).

The crux of Defendants' arguments to dismiss Count I of the Amended Complaint is that Plaintiff has failed to establish (1) the requisite scienter on the part of any Defendant and (2) the last of the *Dura* elements, loss causation.   Although Defendants begin their analysis with arguments regarding loss causation, the Court first considers scienter.

B.   Scienter

Defendants argue that Plaintiff's scienter allegations, largely identical to those in *Payne*, fail to give rise to a strong inference of fraudulent intent or any other wrongful state of mind on the part of any Defendant.   They further argue that for this long-past Class Period, the allegations are based on hindsight  without contemporaneous factual support of scienter on the part of any Defendant. The Court notes that a large part of the Amended Complaint in *Glover* is an exact replica of the *Payne* SAC. Inasmuch as the claims and arguments related to scienter which were raised by the plaintiffs in *Payne* have been exhaustively examined in the opinion dismissing that case, only the new allegations are discussed herein.

The Court disagrees, however, with Defendants' argument that  any allegations related to conduct before or after the Class Period should be rejected categorically in considering whether Plaintiff has raised a strong inference as to scienter on the part of a particular Defendant. Defendants rely for this argument on an earlier holding in the opinion dismissing the first amended

---

[11]  As noted in *Payne*, 433 F. Supp.2d at 558-559, a securities fraud suit alleging fraud-on-the-market provides a presumption of reliance for the plaintiff.  Because Plaintiff herein makes the same allegations concerning an efficient market for ITG stock as were alleged in the *Payne* SAC (*see* AC, ¶¶ 473-474), transaction causation will not be discussed further herein.

10

complaint in *Payne* and cases cited therein.[12] (*Payne*, Docket No. 68 at 19, n.6), However, the decision to which Defendants refer was rendered on December 16, 2004, before the Third Circuit Court of Appeals had considered this particular issue. On December 15, 2005, the Court of Appeals held that a district court had erred by concluding the plaintiff could not rely on statistical data collected prior to the class period to support its allegations that later statements by the defendant were misleading. *See In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 271-272 (3d Cir. 2005). Drawing on two cases from the Second Circuit, the *In re Merck* Court held that inferences of what the defendants knew during the class period could be based on evidence of their knowledge after the class period. *Id.*, *citing Novak v. Kasaks*, 216 F.3d 300, 312-313 (2d Cir. 2000). By the same token, pre-class information was relevant to show the defendants' knowledge at the start of the class period. *Id.*, *citing In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (both post- and pre-class-period data could be used to "confirm what a defendant should have known during the class period," noting that "any information that sheds light on whether class period statements were false or materially misleading is relevant"). Therefore, to the extent the Court previously disregarded pre- and post-Class Period information, that decision is no longer good law in light of *In re Merck*. Accordingly, the Court will consider such allegations in determining Defendants' scienter.

The Court of Appeals defines scienter as

> a mental state embracing intent to deceive, manipulate or defraud, or, at a minimum, highly unreasonable conduct, involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary

---

[12] Defendants also cite to *In re Apple Computer, Inc.*, CA No. 03-16614, 2005 U.S. App. LEXIS 5511 (9th Cir. Apr. 4, 2005), and *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 847 (9th Cir. 2003). Those cases, of course, are not binding precedent on this Court. While the *In re Merck* Court did not address either *In re Apple Computer* or *In re Read-Rite Corp.*, it found that another case from the Ninth Circuit, *In re Clearly Canadian Sec. Litig.*, 875 F. Supp. 1410, 1420 (N.D. Cal. 1995), which held that statements made outside the class period were irrelevant to the plaintiffs' fraud claims and upon which the lower court in *In re Merck* had relied, was "meager support" for the conclusion that inferences of scienter could not legitimately be drawn from information outside the class period. *In re Merck*, 432 F.3d at 272.

care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*In re IKON Office Solutions, Inc. Sec. Litig.*, 277 F.3d 658, 667 (3d Cir. 2002) (citations and internal quotations omitted).

The PSLRA requires a plaintiff, "with respect to each act or omission," to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *GSC Partners,* 368 F.3d at 237, *quoting* 15 U.S.C. §78u-4(b)(2). A plaintiff may satisfy the "strong inference" requirement in either of two ways: "(a) by alleging facts sufficient to show that defendants had the motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Burlington*, 114 F.3d at 1418 (internal quotation omitted). The Third Circuit has held that to the extent the general pleading permitted with respect to mental state established in Rule 9(b) conflicts with the PSLRA's heightened scienter requirements, the PSLRA "supersedes Rule 9(b) as it relates to Rule 10b-5 actions." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531, n.5 (3d Cir. 1999). The appropriate sanction for complaints which fail to meet the PSLRA scienter requirement is dismissal. *Id.* at 531.

1.   *Motive and Opportunity:*   Defendants first argue that the Amended Complaint lacks any allegation as to motive and opportunity for any Individual Defendant to violate the securities laws. They emphasize that during the Class Period, and for more than a year thereafter, no Defendant sold his shares of ITG stock until DeLuca's sales in October and November 2001.[13] They further argue that because both Carlyle and some Individual Defendants

---

[13] As the Court concluded in *Payne*, if DeLuca knew "true facts" which were concealed from investors regarding the Company's serious financial trouble, he would have sold his stock during the summer of 2001 when stock prices reached a high of $7.75 per share and not have waited until news of the Company's problems began to emerge in October 2001. Plaintiff here alleges that the fraud actually began as early as 1998 and that DeLuca was at all times a participant in the fraud. If this were true, he logically should have sold in May 1999 when ITG stock reached its historic high of $17.25 per share or at least soon thereafter as the stock began its steady decline.

purchased stock during the Class Period and thereafter, the more logical inference is that they were not engaging in fraudulent activity, but, to the contrary, were motivated to keep the Company strong and prosperous.

Plaintiff describes this argument as "misguided" and "irrelevant." Moreover, he contends that Defendants' actions were rationally motivated inasmuch as the Company's existence depended on their scheme to artificially make it appear viable. While conceding that general allegations which can be imputed to any publicly-owned, for-profit endeavor – e.g., a desire to increase stock prices, increase compensation, or continue employment – are not sufficiently concrete to establish scienter, Plaintiff argues that when a company's survival is at stake, the strength of general circumstantial evidence of securities fraud is heightened.

The Amended Complaint makes three explicit allegations regarding motivation.[14]  First, Plaintiff alleges that Defendants' attempts to conceal the Company's insolvency were the "principal motivating factor for the scheme alleged." (AC, ¶ 7).  As numerous cases have held, motives that are generally possessed by most corporate directors and officers – including the desire to avoid breaching loan covenants, maintain the company's credit rating, or avoid disclosing its lack of liquidity – are insufficient to establish scienter. *See, e.g., In re Stonepath Group, Inc. Sec. Litig.,* 397 F. Supp.2d 575, 592-593 (E.D. Pa. 2005); *In re Loewen Group Inc. Sec. Litig.*, CA No. 98-6740, 2004 U.S. Dist. LEXIS 16601, *60-*62 (E.D. Pa. Aug. 18, 2004); and *Wilson v. Bernstock*, 195 F. Supp.2d 619, 637 (D. N.J. 2002). *But see PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 690-691 (6th Cir. 2004) (allegations that defendants were motivated to engage in fraud to avoid default on bank loan agreements and preserve company's continued viability were "suggestive" of

---

[14]  The Court has disregarded Plaintiff's argument that Carlyle was motivated to prolong the Company's existence because it would lose its $45 million investment, its management and acquisition fees, and its preferred stock dividend if the Company collapsed.  While this may be true, Carlyle is not alleged to have violated Section 10(b), and there are no allegations that any Director affiliated with Carlyle took or failed to take actions which would protect Carlyle to the detriment of other stockholders.

scienter and would be considered along with other allegations in determining if defendants had acted at least recklessly). Although the Court agrees that such an allegation, standing alone, is insufficient to establish scienter on the part of any Defendant, it will be considered along with other factors in determining if any Defendant acted recklessly or with conscious misbehavior.

Secondly, Plaintiff alleges that Defendant Soose admitted in deposition testimony given in the associated bankruptcy proceedings that the Company "managed" its cash flow in order to meet quarterly loan covenants by accumulating cash receipts at the end of the quarter and disbursing payments after the covenants had been met. According to Plaintiff, Soose acknowledged that this cash flow manipulation "was motivated both by the desire for loan covenant compliance and the Company's bonus program which used day sales outstanding as a parameter." (AC, ¶ 120). The first of those intents, loan covenant compliance, is addressed in the preceding paragraph. As to the second, there is no allegation that any Defendant participated in the Company's bonus program or in any way stood to benefit from such a program. Thus, this allegation fails to establish a "concrete and personal benefit to the individual defendants resulting from this fraud." *GSC Partners*, 368 F.3d at 237 (quotation omitted).

The third allegation regarding motivation is that shortly after the OHM acquisition in 1998, Defendants began overstating the Company's revenue and liquidity, "motivated by a desire to conceal the bad receivables and liquidity shortage which the Company experienced as a result of that acquisition." (AC, ¶ 471). In a similar case in which the plaintiffs alleged that the defendants engaged in accounting fraud in order to conceal the "disastrous consequences" of acquiring a subsidiary without discovering "tens if not hundreds of millions of dollars in uncollectible receivables," the court held such an alleged intent was no more than a desire to "conceal a poor management decision" and was not sufficient to show motive and opportunity to commit securities fraud. *Alaska Elec. Pension Fund v. Adecco S.A. (In re Adecco S.A.)*, 371 F. Supp.2d 1203, 1222-1223 (S.D. Cal. 2005). The Court agrees with that reasoning and finds it apropos here.

14

Thus, the Court concludes that to the extent Plaintiff has attempted to show that any Defendant had motive and opportunity to commit securities fraud under this prong of the *In re Burlington* test, those attempts have failed. The Court next considers Plaintiff's allegations from which the Court may infer "strong circumstantial evidence of conscious misbehavior or recklessness."

2. *Reckless Behavior and Circumstantial Evidence of Scienter:* Under the PSLRA, the degree of recklessness associated with scienter may not be "merely simple, or even inexcusable negligence," but rather such an "extreme departure from the standards of ordinary care" that the defendant knows he is misleading investors or his misbehavior is so patently obvious that he must have been aware of it. *In re Advanta*, 180 F.3d at 535. The *Advanta* court further noted that "scienter may be alleged by stating with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior." Id. The Third Circuit has compared the level of reckless behavior required to "closely approach[ ] that which attaches to conscious deception." *In re Digital Island Sec. Litig.*, 357 F.3d 322, 332 (3d Cir. 2004). Recklessness is not intended to encompass "claims essentially grounded on corporate mismanagement." *Id.*, quoting *In re Advanta*, 180 F.3d at 540, and comparing recklessness to "conscious disregard" and "deliberate ignorance."

The strong inference of scienter must attach to each Defendant. *In re Digital Island Sec. Litig.*, 223 F. Supp.2d 546, 553 (D. Del. 2002), aff'd 357 F.3d 322 (3d Cir. 2004). As the Court noted in *Payne*, the consensus among courts in this Circuit is that group pleading did not survive enactment of the PSLRA. *Payne*, 433 F. Supp.2d at 569-570, *citing In re Bio-Technology Gen. Corp. Sec. Litig.*, 380 F. Supp.2d 574, 584 (D. N.J. 2005). Defendants correctly note that Plaintiff has advanced the same generalized allegations against "Defendants" as a group, rarely mentioning them by name. Other than reference to the fact that each Individual Defendant signed the Forms

15

10-K for 1998,[15] 1999, and 2000 as well as the Form S-4/A filed in September 1999 in connection with the exchange of $225 million in notes,[16] no particularized allegations are brought against any Defendant.[17] Therefore, the Court cannot rely upon generic allegations, including claims that "Defendants" were alerted to improper accounting practices in September 1999 when the ITG controller resigned or that "Defendants" knew a certain project was "a fiasco" in determining scienter for any particular Defendant.

Plaintiff also makes general allegations about what Defendants knew by virtue of their positions with the Company. For instance, Plaintiff contends that the members of the Board of Directors "were fully informed about the true state of IT Group's receivables" by virtue of receiving the same information as that provided to the Company's lenders in the Monthly Compliance Letter Packages. Similarly, the Audit Review Committee members[18] received the same documents in advance of their meetings. Such blanket allegations that an Individual Defendant "knew or should have known" certain facts by virtue of his position in the Company, without more, are insufficient to plead scienter. See In re Advanta, 180 F.3d at 539 and cases cited therein. Furthermore, while directors should be "fully informed" about problems associated with collecting accounts receivable,

---

[15]   Defendant Harvey was not a member of the Board of Directors when the 1998 Form 10-K was signed and therefore this portion of the allegation does not pertain to him.

[16]   This allegation is not pursued by Plaintiff as a basis for establishing scienter on the part of any Individual Defendant. See Kennilworth Partners L.P. v. Cendant Corp., 59 F. Supp.2d 417, 428 (D. N.J. 1999) and cases cited therein, rejecting allegations of scienter based on the fact that directors had signed the defendant's SEC forms and "had access to facts" because of their positions as directors or officers of the company.

[17]   Plaintiff makes one additional allegation involving Defendant Dolan. Confidential Witness 6 (CW 6), the Company's director of corporate development, stated that "part of the deal with Carlyle" in exchange for its $45 million investment was that ITG would "embark on a massive acquisition program." Although ITG had its own due diligence team headed by CW 6, Carlyle conducted independent due diligence for each acquisition. During the due diligence process prior to the OHM acquisition, CW 6 met Defendant Dolan who was with Carlyle personnel, performing a parallel due diligence investigation. Plaintiff makes no further reference to this allegation and its import to the Court is unclear insofar as it may pertain to scienter or any material misrepresentation or omission on the part of Defendant Dolan.

[18]   The Audit Review Committee included Defendants McGill, Pogue, Gibson and Pugliese.

16

possessing such knowledge does not mean that a Defendant acted recklessly or even negligently in failing to demand that the Company immediately disclose those problems to the investing public.

Plaintiff also argues that knowledge may be attributed to the Individual Defendants because the alleged public misstatements and omissions relate to core operations of the Company, such as: its backlog of government contracts; the growth-by-acquisition strategy and the associated dubious accounting practices, and the need to achieve loan covenant compliance. He analogizes the facts herein to those of *In re Aetna Inc. Sec. Litig.*, 34 F. Supp.2d 935, 954 (E.D. Pa. 1999), in which the court held that the plaintiff had sufficiently alleged scienter on the part of officers who were involved on a daily basis with a core activity of the business and who made misrepresentations concerning the success of the integration and its financial impact on the defendant. (*See also Epstein v. Itron*, 993 F. Supp. 1314, 1326 (E.D. Wash. 1998); *In re Tel-Save Sec Litig.*, CA No. 98-3145, 1999 U.S. Dist. LEXIS 16800, *14-*15 (E.D. Pa. Oct. 19, 1999); and *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp.2d 574, 599 (D. N.J. 2001), all of which denied motions to dismiss in part because the plaintiff successfully pled that facts critical to the business's core operations were so important they could be attributed to key officers).

Accepting that each of the matters identified by Plaintiff could be considered a "core operation" of the Company during the Class Period, such allegations, based on Defendants' status as senior officers and directors, pass muster "only when taken together with more specific allegations linking their positions to their knowledge." *Kennilworth Partners, L.P. v. Cendant Corp.*, 59 F. Supp.2d 417, 428 (D. N.J. 1999) (internal quotation omitted). Courts have been hesitant to impute knowledge to a defendant pursuant to the core business doctrine "absent particularized allegations showing that defendants had ample reason to know of the falsity of their statements." *In re Stonepath Group, Inc. Sec. Litig.*, CA No. 04-4515, 2006 U.S. Dist. LEXIS 15808, *34-*36 (E.D. Pa. Apr. 3, 2006). This cautious approach is not only prudent, but necessary to remain consistent with the Court of Appeals' position rejecting generalized imputations of knowledge based

17

on the defendant's position in the company. *In re Stonepath Group, id.* at *36, *citing In re Alpharma*, 372 F.3d 137, 149 (3d Cir. 2004).

The Court first distinguishes between Messrs. Soose and DeLuca and the rest of the Individual Defendants who were members of the Board of Directors. As in *Payne*, the Court concludes that Plaintiff has failed to offer particularized allegations which show that members of the Board of Directors had ample reason to know that the Company's public statements were false. In reaching this conclusion, the Court focuses on what was known by members of the Audit Review Committee, because they are the sub-set of board members most aware of inconsistencies between public and internal financial information.

Plaintiff alleges that the Defendants who were members of the Audit Review Committee knew about the Company's chronic liquidity crisis but failed to take any actions to correct false and misleading statements to the public about this subject. For instance, the audit results reported to the Audit Review Committee in 2001 showed that project cost accruals as of December 29, 2000, included $86 million of "estimates of invoices received but not entered into accounts payable." Plaintiff contends that calling such estimated revenue a "billed" receivable is highly deceptive as to the amount and quality of claimed revenue. Even if this statement goes to a core operation of the Company, namely, calculation of its revenue, such a claim is unavailing to show what members of the Audit Committee knew during the Class Period because it is based on information they received at least ten months thereafter and there are no allegations which would tie that report to any Defendant's state of mind at an earlier time.[19]

The inferences of scienter based on events which occurred during the Class Period are weak at best. Plaintiff claims that the Audit Review Committee members "were aware of the shaky

---

[19]  Other allegations as to Audit Review Committee members' scienter are stated in ¶¶ 257, 263, 264, and 273 of the Amended Complaint, referring to events which occurred, respectively, on July 25, 2000, September 20, 2000, December 19, 2000, and November 28, 2001.

18

basis for much of IT Group's claimed receivables," based on a mid-February 1999[20] report by the
Company's external auditors, Ernst & Young, which noted that "the Company continues to take an
aggressive position on claim recovery related to certain significant contracts. As of December 31,
1999, there are approximately \$83.9 million of significant outstanding claims, of which
approximately 52% of the claim value has been recognized in project revenues." (AC, ¶ 240).
There is no allegation as to why the auditors believed that either (1) taking an "aggressive position
on claim recovery" was a fraudulent or reckless strategy or (2) recognizing half of the claim value
on those outstanding claims was improper under generally accepting accounting principles (GAAP)
or any other accounting standard.

Plaintiff alleges that when David Hill, a controller who had joined the Company at the time
of the OHM acquisition, resigned on September 3, 1999, "because of IT Group's inflated
receivables and improper accounting practices," he provided a memo to the Board of Directors
objecting to an inadequate reserve allowance for adjustment in the U.S. government billing rate and
a \$2.1 million upward adjustment in income due to reduction of the reserve. Defendants note,
however, that at the September 23, 1999 meeting of the Board of Directors, Defendant McGill,
chairman of the Audit Review Committee, reported on

> the steps being undertaken to resolve any issues raised by [Hill's] memorandum.
> Mr. McGill noted that Ernst & Young has been retained to review the memorandum
> and conduct an internal audit to confirm compliance with proper accounting
> procedures. . . . [T]he Audit Committee will meet with Ernst & Young once their
> investigation has been completed, and the Committee will make a subsequent
> report to the Board of Directors.

(Defs.' Memo at 17, n.11, and Declaration of David A. Becker in Support of Defendants' Motion to

Dismiss, Docket No. 57, "Becker Decl.," Exhibit T, at 2).

Plaintiff fails to explain the outcome of this discussion, either in the Amended Complaint or

---

[20] The Court assumes this is a typographical error and that the proper date was approximately
February 15, 2000. Alternatively, the December 31 date could refer to 1998, not 1999.

in his brief in opposition, so the Court is left to speculate as to its import. Although the pleadings appear not to include the subsequent report, the fact that the Audit Review Committee took the memorandum seriously enough to refer it to external auditors for review suggests that Hill's concerns were addressed rather than being recklessly disregarded.

The Court finds that these allegations fail for the same reasons that similar imputations of knowledge failed in *Payne*. Although Plaintiff sets out what Defendants knew about core operations of the Company by virtue of their positions as members of the Audit Review Committee and doubtless such information would be within the scope of what such individuals should know and should act upon, Plaintiff simply leaps to the conclusion that the Individual Defendants were aware of the falsity of public statements made about reserve allowances for government contracts or related financial information. If Plaintiff had come forward with, for instance, an allegation that the Audit Review Committee concluded that the accounting practice in question might be a violation of GAAP, but recklessly allowed the practice to continue without closer scrutiny and thereby generate false financial statements, that would be a completely different matter. But no such allegations have been made here. Moreover, even in such circumstances, a defendant's awareness of improper accounting must be accompanied by allegations showing an intent to defraud the public regarding the content of the company's financial reports. *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 157 (2d Cir. 1998). In the instant case, Plaintiff has failed to allege that any member of the Audit Review Committee had such intent.

Defendants argue that the circumstantial evidence offered by Plaintiff herein consists of no more than "recycled allegations already rejected by the Court, allegations impermissibly based on speculation and conjecture, and fraud-by-hindsight allegations that cannot support a strong inference of scienter." (Defs.' Memo at 15). According to Defendants, the only new scienter allegations are (1) the accounting issues raised by Hill, which the Court has already addressed, and (2) a hindsight attack on the Company's accounting practices with respect to acquired receivables

20

which were scrutinized throughout the Class Period and ultimately adjusted due to changed circumstances. A detailed review of the Amended Complaint, however, identifies five subjects about which Defendants allegedly misrepresented the Company's financial condition to investors:

1. The success of the OHM integration, the negative effect of uncollectible accounts receivable acquired with OHM, and the Company's failure to timely write-off those accounts;

2. The Company's accounting manipulations and violations of loan covenants;

3. Misleading statements about the Company's financial condition in SEC filings and press releases;

4. The failure to pay vendors, the effect of pay-when-paid regulations on the Company, and its inability to abide by those regulations; and

5. The value and reliability of the ITG contract backlog.

Having concluded for the same reasons as set forth in *Payne*, 433 F. Supp.2d at 567-572, that Plaintiff has failed to establish even a weak inference of scienter on the part of any Individual Defendant except Messrs. Soose and DeLuca, the Court considers the foregoing five subjects vis-a-vis the potential scienter of only those two Defendants.

## C.    Material[21] Misrepresentations and Omissions

Rule 10b-5 provides that it is a violation of securities law "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5(b); *In re Burlington*, 114 F.3d at 1417, n.5. Rule of Civil Procedure 9(b) requires a plaintiff alleging violation of Section 10(b) to show: "(1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and

---

[21] *See Payne*, 433 F. Supp.2d at 573-574 for a further discussion of materiality.

21

(5) that the plaintiff acted upon it to his damage." *In re Rockefeller Ctr.*, 311 F.3d at 216 (internal quotation omitted). The PSLRA further requires that the complaint "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1).

Although Plaintiff argues that the heightened pleading requirements of Rule 9(b) and the PSLRA apply only to allegations regarding scienter, the Court finds that the Third Circuit has determined that a more demanding standard is applied also to allegations of falsity. *See Oran,* 226 F.3d at 288, noting that "both the PSLRA and Federal Rule of Civil Procedure 9(b) impose heightened pleading requirements on plaintiffs who allege securities fraud." Since falsity is an element of fraud, it follows that the PSLRA requires a plaintiff to "plead both falsity and scienter with particularity." *In re Digital Island Sec. Litig.*, 223 F. Supp.2d at 551. Therefore, the allegations regarding false and misleading misrepresentations and omissions which have not already been addressed in *Payne* are analyzed under the more exacting standard of the PSLRA.

In most instances, the materiality of a particular statement is a matter to be determined by the fact-finder. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 239-241 (1988). However, certain statements are so clearly immaterial that a court may reach that conclusion in considering a motion to dismiss. *In re Rockefeller Ctr.*, 184 F.3d at 294. For purposes of the analysis which follows, the Court assumes that each of the statements identified by Plaintiff – or the subject matter of the alleged omission – is material.

　　　1.　*The negative effect of uncollectible accounts receivable acquired with OHM and problems with ITG/OHM integration*: Defendants argue that the hindsight allegations regarding receivables acquired from OHM and other projects are illogical and do not raise any inference of scienter. Furthermore, there is no contemporaneous evidence of fraud on the part of any Defendant and the theory pursued by Plaintiff is implausible.

ITG acquired OHM Corporation, one of its chief competitors in the environmental

22

remediation field, in February and June 1998. After this $303.4 million transaction, ITG refinanced its credit facilities to consist of an eight-year $228 million amortizing term loan and a six-year $185 million revolving credit facility (Revolver).

According to Plaintiff, "the OHM acquisition greatly exacerbated the Company's liquidity problems because OHM carried substantial amounts of accounts receivable on its books which were uncollectible and should have been written off even prior to . . . the acquisition." (AC, ¶ 97). Plaintiff alleges that after acquiring OHM, "it soon became known that OHM's receivables were of questionable collectibility" and, as a result of failing to collect those receivables, the Company was secretly insolvent. (AC, ¶ 12). "Rather than take the necessary write-downs, Defendants began a pattern and practice of disguising write-downs through acquisition accounting, while reassuring the investing public at every opportunity that the Company's liquidity was sufficient." (AC, ¶ 13).

In a report dated November 6, 1998, an internal auditor of Citibank (apparently one of the lenders involved in the OHM transaction), reported that "OHM has historically left receivables from troubled accounts on the [accounts receivable] aging rather than write-off the account in a timely fashion."[22]   (AC, ¶ 97 and Exhibit D at 3).   Plaintiff alleges that because these "bad" OHM receivables were retained on the Company's books, the amounts shown as accounts receivable in the SEC Form 10-K for 1998, the Forms 10-Q for first three quarters of 1999, and the September 1999 Form S-4/A were falsely overstated. He also claims that an unspecified number of these bad receivables remained on ITG's books until December 2001 when the Company made its "covert restatement of receivables."  (AC, ¶ 97).

Succinctly stated, Plaintiff's allegations in this regard focus on the effect the OHM

---

[22]   Although Plaintiff alleges that Defendants knew of the OHM accounts receivable problems in 1998 based on this report (AC, ¶ 251), Exhibit D does not show that any member of ITG management received it, nor are there other factual allegations to support a claim that any Defendant knew of this report in 1998 or any time during the Class Period.  Moreover, even if they had, the statement quoted does not show that the receivables from "troubled accounts" were uncollectible, only that OHM had not written them off, reflecting nothing about Defendants' scienter on the collectibility issue.

23

uncollectible accounts had on the Company's reported revenues and assets. If the accounts were known to be uncollectible, they should have been written-off as soon as possible in accordance with GAAP. By keeping uncollectible accounts receivable on the Company's books, its cash flow and assets were falsely inflated, misleading investors about ITG's financial stability and anticipated future income as those accounts were collected.

Plaintiff has scattered the allegations pertaining to OHM throughout the Amended Complaint, but they can be grouped into four categories: the initial valuation of the accounts receivable; the uncollectibility of those accounts; improper purchase accounting practices; and false public statements about the success of the OHM integration.

a.    *Initial valuation of OHM accounts receivable:*  Plaintiff argues that OHM accounts receivable were over-valued at the time of the merger. In support of this position, Plaintiff first notes that in the Spring of 1998, ITG wanted to take a maximum of $10 million fair market value decrease for OHM's Occidental Chemical, Sterling Winthrop, and Monticello projects as part of its acquisition accounting. The SEC, "aware of the potential for inflating earnings through acquisition accounting write-downs," asked ITG to justify that amount.  (AC, ¶ 252 and n.11).  The subject was addressed in a conference call with the SEC on May 7, 1998, in which Mr. Soose participated. Ultimately, the Form S-4 filed with the SEC disclosed a maximum write-down of $1.5 million for the three OHM projects, indicating "heightened awareness on the part of the IT Group that the OHM projects were overvalued."  (AC, ¶ 252).[23]

There is no factual support for Plaintiff's speculation that the SEC asked ITG to decrease the amount written off for the OHM projects because it was concerned that ITG would inflate its

_____

[23]  A letter to the SEC from Soose also dated May 7, 1998, explained that the three projects involved contracts in process and litigation accruals with a cumulative maximum value of $10 million.  (AC, Exhibit R at 5).  When the assertions in this letter were questioned by the SEC, the Company agreed to exclude from its "pre-acquisition contingency for contracts in progress and litigation accruals" the two contracts which were in progress, apparently leaving a $1.5 million contingency account for the Occidental Chemical contract.  (Exhibit R at 2).

earnings through acquisition accounting write-downs. In fact, based on the content of the letters between the SEC and ITG, the Court is unable to draw any inference - much less a strong inference - of scienter on the part of Defendant Soose based on his participation in this exchange. It appears ITG had offered a rationale for its "$10 million additional maximum liability or fair market value decrease" for the three projects, the SEC questioned that rationale, and the Company agreed to reduce the amount. Without further analysis or argument by Plaintiff as to why this action reflects a reckless or fraudulent over-valuation of those projects, the Court cannot accept Plaintiff's blanket allegation in this regard.

Plaintiff further claims that IT Group's initial valuation of the OHM receivables was "highly suspect" because it was performed by Ernst & Young, who audited OHM as well as ITG. Permitting the auditor to act in this dual capacity created a conflict of interest which was contrary to GAAP in 1998, as reflected by the fact that in February 2001, the SEC amended its regulations to prohibit such dual representation. The Court declines to draw any inference that the initial valuation of the receivables was highly suspect because the SEC proposed changing its regulations on this subject two years *after* the acquisition was made. Moreover, there are no factual allegations from which to infer that the SEC questioned Ernst & Young's evaluation of OHM receivables in 1998 or that any Defendant knew that dual representation might someday be considered an unsound accounting practice.

*b.*     *The uncollectibility of OHM accounts receivable:* Many of the allegations about the uncollectibility of OHM accounts receivable arise from documents created shortly after the end of the Class Period on February 23, 2000. The Court has considered those documents not for their factual content, but rather to determine if any Defendant would have known during the Class Period that the accounts receivable in question were truly not collectible and,

25

therefore, that including those accounts would misrepresent the Company's financial condition.[24]

Plaintiff alleges that "although Defendants knew from . . . prior circumstances that the OHM

receivables were troubled, Defendant Soose professed to learn this fact for the first time in mid-

2000." (AC, ¶ 254). Plaintiff claims that at the July 25, 2000, meeting of the Board of Directors,

Soose reported that the Company had

> recently become aware of potential asset valuation write-downs related to unbilled
> receivables in connection with the OHM acquisition. This matter will require
> significant review and investigation to determine the nature, scope and resolution
> of the matter. It is expected that resolution of this matter will extend into the fourth
> quarter and may require a noncash charge.

(AC, ¶ 254 and Exhibit T).

At an Audit Review Committee meeting held on September 20, 2000, in-house counsel

James Kirk and Soose reviewed specific accounts which were, Plaintiff claims, "doubtful at best."

(AC, ¶ 263 and Exhibit AA).  These accounts included four projects which were in litigation:

American Creosote/Cape Fear, Coakley, Earth Tech, and TNRCC.[25]  Soose stated, in effect, that

the reserves set aside for those projects might have to be increased depending on the outcome

of the litigation or future developments.  The minutes of the meeting further stated:

> An acquisition evaluation review, as well as the ongoing accounts receivable review,
> including a detailed by-product review of unbilled accounts receivable contained in
> acquired computer systems including the Oracle system were discussed. In this
> regard, approximately two hundred (200) projects are being reviewed which
> represent over 70% of the universe. Discussion with project managers, project
> administrators, and business line presidents has commenced and is expected to be
> a lengthy process which will include interface with clients to determine realization
> estimates.  As earlier anticipated, the review process is scheduled to be completed
> during the later part of the fourth quarter.  Mr. Soose summarized that previously

---

[24]  Unless otherwise noted in the text, for purposes of determining Defendants' scienter, the Court
has disregarded allegations in AC ¶ 258 and Exhibit W; ¶ 253 and Exhibit S; ¶ 259 and Exhibits V and X;
and ¶ 261 and Exhibit Z.  None of these documents indicates the author, the recipients, or the purpose for
which it was prepared, all of them are dated after the end of the Class Period, and none of them provides
any insight into what any Defendant knew during the Class Period.

[25]  Plaintiff provides only this one reference in the Amended Complaint to "TNRCC" and does not
refer to it in his brief in opposition to the motion to dismiss.  The Court has been unable to identify this
project independently.

established reserves are adequate, however [they] will be evaluated in conjunction with the results of the review.

(AC, ¶ 254 and n.12).

Plaintiff contends that ITG should have "exhaustively reviewed" the status of OHM's receivables as entered into the Oracle computer system when the company was acquired in 1998, not two years later. (AC, ¶ 254). At best, this is an allegation of mismanagement or negligence, not fraud.

At the December 19, 2000, Audit Review Committee meeting, Messrs. Kirk and Soose again provided a detailed review of accounts receivable problems associated with the four previously-mentioned projects and three other OHM projects:  Penn Mines, Occidental, and Wellsville.  The minutes of the meeting state:  "[a]s a result of recent developments and a change in strategy emphasizing the acceleration of cash receipts over contentious expensive litigation, the previously estimated recoveries are expected to be reduced."  This change in strategy would result in a special non-cash charge in the fourth quarter of the year.  (AC, ¶ 264 and Exhibit BB).

Despite all his allegations regarding the uncollectibility of OHM receivables, Plaintiff never clarifies (1) how the Company arrived at the conclusion that a certain account was collectible or uncollectible and who made that decision, (2) the materiality of the amounts which were uncollectible, or (3) which Individual Defendants knew those receivables were uncollectible during the Class Period and how they knew it.  A vague allegation that a "substantial amount" of OHM accounts "should have been written off" at the time the company was acquired fails to establish any of those facts.  In *Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004) (*Chubb*), the Third Circuit held that plaintiffs who allege that defendants distorted data disclosed to the public by using unreasonable accounting practices must state what the unreasonable practices were and how they distorted the disclosed data.  *Chubb*, *id.* at 153-154, *citing In re Burlington*, 114 F.3d at 1417-1418.  These requirements include identifying with particularity the

27

source for their accounting fraud claims, *i.e.*, someone who would reasonably have knowledge supporting the allegations that the defendants' financial statements were false, the data plaintiffs used to arrive at their calculation of the magnitude of the fraud, the amount by which financial data were distorted, or how much revenue was improperly recognized. *Id.* at 154; *see also* note 18, comparing the allegations of accounting fraud in *Chubb* to those set out in *In re Cabletron*, 311 F.3d 11 at 24, 27, 31-32 (1st Cir. 2002), where the plaintiffs had pled estimates of the actual amount of improperly recognized revenue and provided adequate supporting details, *e.g.*, names of customers and specific products. After *Chubb*, district courts have concluded that the plaintiff must plead "facts that would demonstrate which accounts were unlikely to be collectible, when and by what level the accounts receivable figure on [the company's] books should have been decreased, why the allowances [the company] set aside for uncollected accounts receivable were unreasonable or how many accounts were in fact uncollectible." *In re Loewen Group Inc. Secs. Litig.*, CA No. 98-6470, 2003 U.S. Dist. LEXIS 15680, *30-*31 (E.D. Pa. July 16, 2003). Plaintiff has not supported his allegations of accounts receivable overstatement with any of these facts; he has merely identified projects and asserted that some unspecified amounts "should have been" written off. Without such allegations, even the company's eventual financial ruin is not "proof that defendants committed any acts worse than mismanagement." *Id.* at *31.[26]

In *In re MCI Worldcom, Inc. Sec. Litig.*, the plaintiffs alleged, as does Plaintiff herein, that the defendants "knew or were severely reckless in not knowing that certain accounts should have been written-off much sooner." 191 F. Supp.2d 778, 790 (D. Miss. 2002). Nevertheless, the court

---

[26] In their motion for reconsideration, now pending in *Payne*, Plaintiffs assert that particular claims were known to be improperly included in ITG's accounts receivable. They identify numerous such accounts - Wellsville, Monticello, Weyerhauser, Lake Apopka, Occidental-OHM - based on handwritten notes by an unknown writer from a meeting held November 13, 2000, at which Soose is alleged to have been present. Such notes are not helpful to the claims herein because nothing there or in Plaintiffs' Exhibit 18, an undated list of "Legacy Claims" on which they also rely, shows the knowledge of any Individual Defendant about the uncollectibility of those accounts and when they should have been written off.

28

in that case held that such allegations were insufficient to state a claim of securities fraud. "Rather, to establish scienter based on improper accounting, Plaintiffs must plead with particularity facts demonstrating that the accounting judgments that were made were such that no reasonable accountant would have made the same decision if confronted with the same facts." In re MCI Worldcom, id. (internal quotation omitted.) Similarly, the plaintiffs there – again like Mr. Glover – argued that the magnitude of the defendants' eventual write off was probative of severe recklessness. The court held that the size of the write-off did not, by itself or in the context of the facts alleged by the plaintiffs, raise a strong inference of scienter. Id. at 791.

In this case, Plaintiff's contention that Defendants were aware of the "highly questionable" nature of many OHM accounts receivable is undercut by facts gleaned from documents he provides. For example, Plaintiff makes a number of claims based on a spreadsheet entitled "Selected Projects Status," dated October 19, 2000. He alleges that the spreadsheet shows two Monticello project claims worth $6.7 million were settled for $435,000. On the Coakley project inherited from OHM, the Company won only $1.1 million dollars on summary judgment and litigation on the remainder was still pending. On the Wellsville project, multiple change order appeals had been rejected. On the Occidental project, ITG was demanding payment while the client counter-demanded $3.5 million from ITG. (AC, ¶ 265 and Exhibit CC.) A two-page document entitled "Project Analysis-Acquired Claims 12/01/00" reflects that despite this knowledge, the Company wrote off only a limited part of the total claims, i.e., $6.3 million of $15.9 million on Monticello, $1.3 million of $9.3 million on Occidental-OHM, $550,000 of $1.7 million on Occidental-IT, $3.4 million of $6.5 million on Coakley, and $1.9 million of $2.8 million on Wellsville. (AC, ¶ 266 and Exhibit S.) By comparing these two documents, Plaintiff implies that Defendants knew OHM projects would eventually have to be written off but chose not to do so because they wished to present a more positive financial picture of the Company.

In reviewing Exhibit CC, the Court concludes that Plaintiff has "cherry-picked" the worst

29

outcomes from the list of some 30 projects while ignoring more positive results. For instance, on the Monticello projects, Plaintiff's implication that the strength of this claim was "highly questionable" is undercut by the amount of missing information. That is, although ITG inherited this project in 1998, there is no indication of when it was completed or the type of contract. If the contract were a progress payment contract, for example, nothing can be inferred from the fact that $4.1 million in claims were yet to be submitted. Contrary to Plaintiff's assertion in the Amended Complaint, the two projects which settled for $435,000 appear to have been originally worth $2.9 million, not $6.7 million. Even if Plaintiff were correct, the Court finds that the amount of an acceptable settlement is a business decision, not a matter subject to regulation under the securities laws. Second, contrary to Plaintiff's assertion that collection on the Coakley project was questionable, the Company had just received $1.1 million on summary judgment out of a possible $1.6 million claim, while continuing to pursue the balance of a $7.4 million claim plus possible triple damages and attorney fees. In the fourth quarter of 2000, the parties to the Coakley claim settled their lawsuit with ITG receiving approximately $3.1 million from the customer but continuing its suit against the project engineering design firm. The Company's successful pursuit of another OHM acquisition claim which Plaintiff describes elsewhere as uncollectible, Sterling Winthrop, is reflected in the fact that Exhibit CC notes that the claim had closed with "all outstanding amounts now received, including insurance claim amounts." Finally, as late as April 2001, ITG was successfully collecting OHM receivables that Plaintiff describes as "doubtful at best." Plaintiff's Exhibit L, a memo from DeLuca to the Board members dated April 5, 2001, notes that the Company had just received a $9.1 million jury verdict in the Earth Tech litigation. DeLuca wrote: "The total award is estimated at $10 to 11 million, compared to a book value of $1.5 million." All of these successful collections undercut Plaintiff's blanket assertion that ITG did nothing to address these allegedly uncollectible receivables.

The Court agrees with Defendants that Plaintiff's reliance on the write-down of uncollectible

receivables in December 2000 and December 2001, many of which were associated with OHM, is inadequate to establish that either DeLuca or Soose knew that those accounts receivable were uncollectible during the Class Period and therefore knowingly allowed the Company's financial statements to be overstated by their inclusion.

Plaintiff again asks the Court to draw conclusions of reckless or fraudulent behavior simply by setting out evidence that the Company's directors and officers were aware of the problems associated with collecting OHM receivables. To some extent, Plaintiff appears to be equating a culpable state of mind with knowledge and concern. The fact that Defendants systematically reviewed the collectibility of certain accounts receivable in the summer of 2000 does not necessarily lead to the conclusion that they thereafter fraudulently manipulated the Company's financial picture by refusing to write off those accounts, much less that they had done so prior to the review. The Audit Review Committee discussions of pending litigation and projects that were in prolonged negotiation with customers reflect that it was functioning properly, not developing a scheme to defraud investors.

Plaintiff repeatedly alleges, but never explains why, a particular account receivable was uncollectible. With the benefit of hindsight, any account which is ultimately written off can be considered uncollectible. But there is no allegation that during the Class Period the Individual Defendants knew a particular account was uncollectible *in toto*, only that they were aware that certain accounts might not be collected in full. For those accounts, the evidence shows that the Company set aside reserves as it should have. (*See, e.g.,* AC, Exhibit AA, the minutes of September 20, 2000, Audit Committee meeting discussing possible adjustments in reserves as more was learned about the collectibility of accounts). While management should be expected to reasonably estimate whether the collectibility of a particular account receivable is "highly questionable" or of a "tenuous nature" as Plaintiff argues or, conversely, a good bet, the accuracy of that estimation can only be determined after the fact. As Judge Friendly wrote, while "greater

31

clairvoyance" might have allowed Defendants to predict subsequent developments, "failure to make such perceptions does not constitute fraud." *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978). Had Defendants taken no action on the OHM accounts receivable, Plaintiff would have a stronger argument that they recklessly or willfully misrepresented the total accounts receivable by including amounts they knew were questionable. But the exhibits provided by Plaintiff himself, including Exhibits L and CC, show that the Company pursued those accounts – with at least some success – from 1998 through and including the second quarter of 2001.

Because Plaintiff has failed to cite - and the Court's review of the voluminous documentation submitted by both parties has failed to disclose - any contemporaneous statement by any Defendant from which one could infer he believed that collectibility of any specific account was questionable, it is only with the benefit of hindsight that Plaintiff has arrived at this claim. A business decision to pursue, rather than write-off, certain accounts receivable or even the ultimate lack of success in pursuing those accounts – without more – does not expose management to liability under the securities laws.

As the final point on the issue of collectibility, Plaintiff points to the fact that when Ernst & Young was preparing the financial statements for fiscal years 1998, 1999, and 2000, the auditors required Defendants DeLuca and Soose to take "the highly unusual step" of providing a list of specific claims and change orders, including receivables for several OHM projects.[27] In each instance, management represented that "[t]here is a legal basis for recognition of the claims and change orders included . . . for the amounts recorded as assets in the financial statements." (AC,

---

[27] Plaintiff also relies on a letter to Ernst & Young from the ITG Controller, James J. Pierson, dated March 24, 2000, in which Mr. Pierson states that Ernst & Young was entitled to rely on the "unaudited historical data" as well as ITG management's assumptions and forecasts, and acknowledged that the terms of the auditor's engagement did not require it to update its analysis for events occurring after the auditors issued a valuation analysis of certain "built-in gain assets" in 1998. (AC, ¶ 256 and Exhibit U). Although Plaintiff alleges that this letter is also unusual and reflects Ernst & Young's concerns about the "dubious value of OHM assets," he has failed to explain these speculative statements in the brief in opposition to the motion to dismiss and nothing in the Amended Complaint or Exhibit U itself indicates what caused Ernst & Young to request this letter.

¶¶ 245-246 and Exhibit Q).[28]  Plaintiff claims that the 2001 representation letter in particular shows that "receivables for each of these projects were offset by reserves of approximately 50%, demonstrating again the widespread knowledge that these were dubious claims."  (AC, ¶ 246).

There is no factual allegation to support Plaintiff's contention that Ernst & Young required such a letter because of its "increasing concerns about the collectibility of IT Group's claimed receivables."  (AC, ¶ 245).  Nor does Plaintiff explain, either in the Amended Complaint or in the brief in opposition to the motion to dismiss, why he considers this requirement "highly unusual." The statement about there being a legal basis for the claims is only one of many regarding internal documentation and financial analyses on which Ernst & Young could rely in preparing the audited financial statements.  Other documents and analyses include:  minutes and contracts, disclosure of risks and uncertainties, related party transactions, and methods for revenue recognition.  Finally, if the Court is expected to conclude that Messrs. DeLuca and Soose knew when they signed the management letters that there was no legal basis for recognition of the amounts recorded as assets in the financial statements, Plaintiff provides no factual foundation for that speculation.

        c.    *Improper purchase accounting:*  Plaintiff claims that some OHM write-offs were disguised through "purchase accounting." [29]  In support of this argument, he points first

---

[28]  The full text referenced to by Plaintiff appears in the section of each representation letter entitled "Receivables."  Defendants DeLuca and Soose stated, in relevant part, that "receivables represent valid claims against the debtors indicated and do not include amounts for . . . services provided on contingent approval or other types of arrangements not constituting sales."  (AC, Exhibit Q, letter of February 15, 1999, at page 4).  The letter goes on to say "unbilled and other receivables resulting from unapproved change orders and claims relate to contract costs to which the Company has a legal basis to recover and are generally recorded at zero percent margins. The evidence supporting the claims are [sic] objective and verifiable.  The costs incurred on the contracts to which corresponding amounts of revenue are recorded were caused by circumstances that were unforeseen at the contract date and are not the result of deficiencies in the Company's performance.  These costs are identifiable or otherwise determinable and are reasonable in view of the work performed.  We believe these receivables will be fully realized.  There is a legal basis for recognition of the claims and change orders included [in an appendix] for the amounts recorded as assets in the financial statements."  (*Id.*)  Comparable language appears in the letters dated February 18, 2000, and February 14, 2001, also included in Exhibit Q.

[29]  Defendants argue that Plaintiff's allegations are illogical because the fraud alleged concerning OHM receivables would make the Company's financial picture appear worse, not better.  Had Defendants determined that the OHM receivables were uncollectible, they would have been motivated to write them off

to "apparent" purchase accounting adjustments taken for OHM projects, as shown in a December 1, 2000, spreadsheet which includes some $12.7 million associated with seven OHM claims. (AC, ¶ 253; *see* Exhibit S, page 1). Next, he refers to the minutes of the July 25, 2000, Audit Review Committee meeting[30] which note that a "correction to OHM acquisition accounting, $10 million" was taken as a retroactive purchase accounting adjustment, because it was written off against goodwill rather than taken as an expense, thus avoiding the disclosure of a write-off. He further claims that a spreadsheet dated March 13, 2001, shows the $10 million write-off was "disguised" as a "purchase accounting utilization." (AC, ¶ 257 and Exhibit V). Finally, a July 21, 2000 spreadsheet[31] addressing revenue recognition in connection with the LandDiv program, also part of the OHM acquisition, recommends $3.7 million of write-offs, but notes that $2.5 million of that can be eliminated through "purchase accounting" and $830,000 through application of a reserve. Thus, the late 2000 special charge included only $1.8 million from the LandDiv program, not the total of $3.7 million. (AC, ¶ 258 and Exhibit W).

Plaintiff claims all these documents support the allegation that ITG engaged in "highly unusual accounting" activities because, generally speaking, "purchase accounting adjustments are restricted to one year from date of transaction." (AC, ¶ 257). This allegation is substantiated by

during the allocation period, not keep them on the books since the receivables would ultimately have to be posted as a loss. Plaintiff counters that Defendants never intended to write off the uncollectible receivables and were forced to do so only when the Company was on the verge of bankruptcy in late 2001. This is a factual dispute better left to a later stage of the litigation when accounting experts are permitted to opine on such subjects. *In re Burlington*, 114 F.3d at 1421. The Court need not address these arguments, however, because, as discussed in the text above, the Court finds that the allegations of improper purchase accounting are speculative and based on theoretical violations of GAAP provisions which did not exist at the time the Company made those adjustments.

[30] Plaintiff refers to the minutes of the July 25, 2000 meeting in his Amended Complaint, which are provided as Exhibit T. (AC, ¶ 257). The Court has been unable to confirm any reference to a "correction to OHM acquisition accounting, $10 million" in those minutes or in the minutes of any other Audit Review Committee or Board meeting.

[31] The spreadsheet is dated July 21, 2000, but the cover memo is dated October 4, 2000. No Defendant is listed among the recipients of this memo.

34

Plaintiff's Exhibit HH, entitled "Issues List for FYE December 28, 2001," and dated December 3, 2001, showing that ITG regularly took purchase accounting write-downs over a two-year period.[32] While conceding that such a practice was "technically allowable at the time it was done," Plaintiff argues that it was to be done only in "exceptional circumstances" and not as a regular practice. (AC, ¶ 302). Moreover, even if such adjustments were made within the proper 12-month period, they would have to be disclosed as a "requirement of good accounting practice, as later confirmed by issuance of FAS 141 effective in 2001."[33] (Id). "Such disclosure would have alerted investments [sic] that either Defendants were over-paying for acquisitions on a regular basis, or IT Group was engaged in irregular accounting practices to inflate revenues." (AC, ¶ 301).

Plaintiff concedes that the GAAP provisions[34] which were in place at the time OHM was acquired permitted ITG to record pre-acquisition contingencies, i.e., foreseeable losses or contingent assets, as part of the fair market values of acquired assets and liabilities if the acquiring entity could show (1) it was probable that the contingency in existence as of the date of the acquisition would actually occur, and (2) the amount of the contingency could be reasonably estimated at the time of acquisition. (Becker Decl., Exhibit W, Statement of Financial Accounting Standards No. 38, "FAS 38," dated September 1980, ¶ 5).[35] A further complication arises when

---

[32] Plaintiff alleges that ITG engaged in this same kind of accounting manipulation with regard to acquisitions other than OHM. See, e.g., AC, ¶¶ 352-353, pertaining to the EMCON acquisition in the Spring of 1999 and the acquisitions listed in AC, Exhibit HH.

[33] FAS 141, which superseded the accounting guidelines discussed in the text, is applicable only to business combinations "initiated after June 30, 2001." (Becker Decl., Exhibit U, at 5).

[34] The Court recognizes that in examining alleged GAAP violations on a motion to dismiss, it is inappropriate to make a factual determination as to whether the company violated a specific accounting rule, particularly where such a ruling would require interpretation and application of complex accounting principles. See, e.g., Fla. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 666 (8th Cir. 2001). However, the issue in this case is not so much a complex GAAP interpretation as it is applying the GAAP provisions which Plaintiff concedes were in place prior to 2001 and which, in the Court's view, are not particularly complex as applied to the facts herein.

[35] See also Becker Decl., Exhibit V, Accounting Principles Board Opinion 16, "APB 16," effective August 1970, which was amended by FAS 38.

the contingency probably will occur, but its amount cannot be estimated as of the acquisition date. This situation opens an "allocation period" allowing the pre-acquisition contingency to be recorded at a later date as part of the purchase accounting if: (a) additional information regarding the contingency is required; (b) the additional information is known to be available; (c) arrangements have been made to obtain the additional information; and (d) efforts to obtain the information are continuing. The allocation period closes when it is no longer reasonable to wait for more information and "usually" will not exceed one year from the acquisition date. (FAS 38, ¶ 4.b).

Plaintiff's allegations that the Company indulged in improper purchase accounting fail for two reasons. First, like the allegation that valuation of the OHM accounts receivable was questionable because two years after the merger in which Ernst & Young acted as auditor for both OHM and ITG the SEC issued a regulation prohibiting such activities, the Court considers this allegation to be an "anticipatory GAAP violation," for lack of a better phrase. That is, the changes in FAS 38 which required purchase price adjustments to be taken within one year and disclosure of those adjustments did not occur until June 2001 when FAS 141 went into effect, well after the events in question. Secondly, Plaintiff simply mis-states the accounting provision when he argues that the adjustments must be taken within the **fiscal year** in which the acquisition was made. The regulation states that "although the time will vary with circumstances," the "usual" period in which to take such contingent adjustments is "one year from the consummation of a business combination" which, depending on the timing of events, could theoretically extend over two fiscal years of the company. (FAS 38, ¶ 4.b).

In view of the *post hoc* nature of Plaintiff's allegations, the Court declines to draw any inference that Messrs. Soose and DeLuca were aware of, much less recklessly allowed, improper purchase accounting in connection with the OHM acquisition.

                  *d.     The success of the OHM integration:*  Plaintiff alleges that DeLuca

falsely presented the integration of OHM as successful when, in reality, the acquisition was plagued with problems in addition to the accounts receivable issue. On October 21, 1998, for instance, ITG issued a press release which Plaintiff characterizes as a "glowing report" about the Company's success in increasing revenues, attributed primarily to the acquisition of OHM. (AC, ¶ 333). Plaintiff alleges that the press release was false and misleading, in part because it claimed that all business lines were doing well and OHM was well-integrated into the Company.

In the press release cited by Plaintiff, DeLuca is quoted as saying:

The fundamentals of generally all business lines are tracking well with our operating plan. . . .

The integration of OHM is complete. All actions necessary to achieve our cost savings targets have been taken, and our organization is totally focused on serving clients and pursuing our markets. Cost savings produced during the integration further reduced SG&A expenses (excluding goodwill amortization) to 4.2% of revenues in the current quarter.

(AC, ¶ 333).

The Court finds that the statements to which Plaintiff objects may reasonably be described as inactionable expressions of corporate optimism. *See In re Aetna*, 34 F. Supp.2d at 945 ("'puffing' statements -- that is, vague expressions of corporate optimism and expectations about a company's prospects -- are not actionable because reasonable investors do not rely on such statements in making investment decisions"); *see also Grossman v. Novell, Inc.*, 120 F.3d 1112, 1121-1122 (10th Cir. 1997), holding that statements that a company had experienced "substantial success" integrating its sales force, that a merger was moving "faster than we thought," and that "by moving rapidly to a fully integrated sales force, we are leveraging our combined knowledge and expanding scope of network solutions" were inactionable statements of corporate optimism.

Plaintiff offers only a blanket assertion that the statutory safe harbor[36] does not apply to "any

---

[36] As defined in the Reform Act, a forward-looking statement (written or oral) is one which contains "a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." *See In re Advanta*, 180

of the allegedly false statements pleaded in [the] complaint" or, alternatively, that those statements related "to then-existing facts and conditions and were not forward-looking." (AC, ¶¶ 475-476). However, this is far too broad a generalization to be applied to every allegation in a 486-paragraph complaint. The Court is not required to accept such "bald assertions" or "legal conclusions." *Chubb*, 394 F.3d at 143. Plaintiff makes no allegations from which to infer that in October 1998, DeLuca knew that the OHM integration – which had begun only six months before – would ultimately not be successful or even what "complete" integration entailed. Accordingly, the Court cannot infer that he knew the statement was false when it was made. In fact, other than problems associated with accounts receivable and the Oracle computer system which contributed to these problems, the Court has been unable to pinpoint any other factual allegations regarding integration problems.

In sum, Plaintiff has failed to establish any material false or misleading misrepresentations regarding the OHM acquisition.

   2. *The Company's accounting manipulations and violations of loan covenants:*

Plaintiff argues that Defendants' scheme for making a "very troubled, insolvent company" appear healthy and profitable was accomplished in two ways: (1) "vastly" understating the Company's debt

---

F.3d at 536, *quoting* 15 U.S.C. §78u-5(i)(1)(A). A forward-looking statement may also address "the plans and objectives of management for future operations." 15 U.S.C. §78u-5(i)(1)(B). Such statements are said to fall within the "statutory safe harbor" of the Reform Act and are not grounds for liability under Section 10(b). *In re Advanta*, *id.* In order to fall within the safe harbor, a forward-looking statement must be identified as such and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 872-873 (3d Cir. 2000), *quoting* 15 U.S.C. §78u-5(c)(1)(A)(i). Cautionary language must be "extensive yet specific." *In re Trump Casino Sec. Litig.*, 7 F.3d 357, 369 (3d Cir. 1993).

  By definition, statements which are not forward-looking are not entitled to protection of the statutory safe harbor provision. Also explicitly excluded are any forward-looking statements "included in a financial statement prepared in accordance with generally accepted accounting principles." 15 U.S.C. §78u-5(b)(2)(A). Nor does the safe harbor provision apply if the statement was made by a natural person (as compared to a business entity) who had "actual knowledge" at the time that the statement was false or misleading. 15 U.S.C. §78u-5(c)(1)(B)(i). If a forward-looking statement later proves to be erroneous, there is no duty imposed by the Reform Act to update such a statement. 15 U.S.C.A. §78u-5(d).

and overstating liquidity each quarter by artificially manipulating its revolving debt balance; and (2) "wildly" inflating receivables by overstating billed receivables while understating unbilled receivables and including as receivables unapproved change orders and other amounts which were uncollectible. The Company thereby created the misleading impression that it had a substantial cushion of credit, was meeting its loan covenants, and was progressing satisfactorily in its publicly-stated goal of debt reduction.   In fact, Plaintiff claims, ITG suffered from a "prolonged liquidity crisis" and had virtually exhausted its available credit for "a substantial portion of the Class Period – a sure sign that bankruptcy was an imminent threat." (AC, ¶ 29). These allegations are discussed *seriatim*. [37]

        *a.     Accounting manipulations:*  Plaintiff argues that during the Class Period, Defendants greatly understated the Company's total indebtedness by manipulating the credit line downward to the lowest point on the last day of each quarter.  This was chiefly accomplished in two ways: (1) postponing payments, particularly to vendors and subcontractors, until the next quarter in order to avoid using the Company's only source of ready cash, and (2) sweeping the Company's divisions for cash and paying down the Revolver, knowing that immediately after the beginning of the next quarter, those amounts would be re-borrowed, moving the debt back to its previous levels.  The manipulation of the credit line affected the financial statements in the Forms 10-K for 1998 and 1999 and in the Forms 10-Q for the first three quarters of 1999.  Plaintiff asserts that Defendant Soose made the scheme an entrenched way of doing business during the second half of 2000 and throughout the *Payne* class period.  Plaintiff further alleges that liquidity position memos provided to Defendants Soose and DeLuca each business day

---

[37]  Plaintiff makes certain allegations about Revolver usage in 2000 and 2001 and about the $100 million Term C Loan which repeat allegations made in the *Payne* Second Amended Complaint. *See*, *e.g.*, AC ¶¶ 103-104, 115-119, 124-137, 145-150, 331, 433, 442-445, 449. The inter-related issues of accounting manipulations and violation of loan covenants are discussed at length in *Payne*, 433 F. Supp.2d at 587-600. Only new factual allegations are discussed herein.

from 1998 through 2001 showed the true extent of the Company's indebtedness. According to Plaintiff, the pattern evident in these memos supports his allegation that the Company was manipulating the revolving credit line balance and hence its reported indebtedness. These quarterly "gyrations" were admitted by Soose[38] and the former ITG Treasurer, Richard Conte (Conte), in depositions and confirmed by other internal Company documents. (AC, ¶ 28).

Although Plaintiff's allegations pertain to information made public during the Class Period, there are few substantive allegations on this topic which have not already been addressed. *See Payne,* 433 F. Supp.2d at 593-594. Examples of new allegations include Conte's deposition testimony that "my first recollection of, quote management, whatever we could manage to meet a covenant, was at the end of 1999." (AC, ¶ 120). Conte is never quoted as explaining what that "management" entailed. He further stated he was told by an unidentified person that "one of the things we'll need to do is manage the payables through year-end to meet a covenant," particularly the loan covenant reflecting debt to EBIDTA, the covenant which "gave us . . . the most difficulty." (*Id.*) The first part of this statement reflects what has already been well-established – that the Company and Defendants knew the implications of taking on heavy debt in order to pursue its acquisitions plan. But both that debt and the implications thereof were revealed to the public. (*See, e.g.*, Becker Decl., Exhibit G, at 19-20, discussing the Company's substantial leverage and ability to service debt; and at 40-41 discussing liquidity). The second part of the allegation regarding the need to "manage the payables" is too vague as to time, source or circumstances to establish scienter on the part of any Defendant.

Once again, Plaintiff resorts to generalizations and relies on events which occurred well after the Class Period. For instance, in discussing the practice of paying down the revolving loan

---

[38] While Plaintiff concedes that Soose "did not admit to outright manipulation of the cash flow to obtain the desired numbers," he characterizes Soose's testimony as an "admission as to the overall pattern followed by Defendants to obtain the numbers [which] when coupled with other information alleged herein reflects that manipulation was in fact the means used to achieve the result." (AC, ¶ 120).

40

in order to create the false impression that the Company had access to a greater amount of credit than it did, Plaintiff argues that  both Soose and DeLuca received the memos reflecting Soose's inception of the scheme and the operation of the scheme. (See AC Exhibit F, PL 2-10, a series of three memos which discuss financial projections in 2000). A review of Exhibit F at PL 2-3 shows the first memo to Soose and DeLuca was dated July 14, 2000, almost five months after the end of the Class Period. The memo presents two cash flow forecasts prepared by Conte, not Soose, described as "calculations of requirements to keep A/P [accounts payable] from further deterioration from the current situation." There are no references to paying down the revolving loan at the end of any quarter; in fact, the memo focuses on anticipated accounts receivable, presumably the source for covering accounts payable. There is nothing in this first memo from which one may infer that Soose initiated the so-called scheme. The second memo, dated August 3, 2000, is addressed only to Soose and includes a statement from which one could infer that he proposed "managing" accounts payable, i.e., a reference to a cash forecast entitled "Harry Soose '$710' Managed A/P." (AC, Exhibit F, at PL 4-9). Conte wrote "in [that] forecast, we managed A/P in the September and December time periods . . . to deal with Total Debt Outstanding Goals of $709 million at September 30 and $615 million at December 31, 2000." The final memo in this group (AC, Exhibit F, at PL 10) shows only that as of November 13, 2000, the Company anticipated falling some $26.4 million short of its goal of paying down the debt to $635 million as of the end of the year.

Based on the foregoing memoranda, the most that reasonably may be inferred is that to the extent there was a "scheme" to create the false impression that the Company had greater credit than it truly did by manipulating accounts payable, Soose did not play any role in that scheme until mid-July 2000 at the earliest, well after the end of the Class Period.

Plaintiff also alleges that Defendants Soose and DeLuca knew, not later than November

13, 2000, that the Company had begun withholding payments to vendors from July 11, 2000.[39] (*See* AC Exhibit F at PL-10). But there is no allegation that this activity occurred during the Class Period or that Defendants had concocted a plan to do so during that time.

Even accepting Plaintiff's contention that Soose instituted a practice of deliberately paying down the credit line at the end of each quarter, he has failed to establish why this practice constitutes fraud, violated the terms of the loan agreements, GAAP, or any SEC regulation, or why it should have been disclosed to the market. As noted in *Payne*, the practice of writing checks to vendors in one quarter but not sending them out until the next would have the effect of increasing actual cash on hand at the end of the quarter, but the Company's accounts payable total would have decreased concomitantly. There are no allegations that the Company was keeping two sets of books to hide these actions. Also, the Court determined in *Payne* that the lending banks received not only the Monthly Compliance Letter Packages which Plaintiff contends show the true amount of the Revolver balance, but also the quarterly reports to the SEC. The banks therefore easily could have detected the pattern of paying down the Revolver at the end of each quarter only to borrow again immediately thereafter. *See Payne*, 433 F. Supp.2d at 585. In order to accept Plaintiff's theory that paying down the credit line at the end of each quarter was fraudulent, one also must infer that the banks fostered this fraud by ignoring the fact that the SEC filings were materially different from the reports provided only to them.

Finally, Plaintiff argues that evidence of scienter on the part of all Defendants regarding manipulation of the revolving credit line is well established by the fact that the Company's bankruptcy trustee and creditors committee filed complaints against all Defendants alleging that the Company was insolvent in 1998, Defendants knew this, and failed to address the insolvency.

---

[39] The Court finds that this may be an over-generalization of the content of this memo which states "we have not moved general A/P date beyond 7/11/00 (applies only to CEC and SGA expenses.)" Not knowing what the parenthetical expression denotes, however, the Court will accept Plaintiff's assertion that the Company withheld payment on payables in general from July 11 onward.

(AC, ¶ 95). The Court declines to accept as evidence of scienter an allegation made in a separate lawsuit in another forum.

The Court concludes that none of the new allegations establish scienter on the part of Defendants DeLuca or Soose with regard to misrepresentations about the Company's revolving credit line. As the court held in *Kushner v. Beverly Enterprises, Inc.*, 317 F.3d 820, 827-28 (8th Cir. 2003), allegations that defendants "designed and implemented" improper accounting practices fail to state a claim for securities fraud in the absence of "allegations of particular facts demonstrating how the defendants knew of the scheme at the time they made their statements, that they knew the financial statements over-represented the company's true earnings, or that they were aware of a GAAP violation and disregarded it." *See also In re Alpharma*, 372 F.3d at 150 (*citing Kushner.*)

b.    *Violation of loan covenants:*[40]    Based largely on Soose's deposition testimony in the Company's bankruptcy proceedings, Plaintiff alleges that "the company knew and it was widely understood" that cash flow at the end of quarters was critical to achieve loan covenant compliance. (AC, ¶ 120). Therefore, as discussed *supra*, cash flow was managed so the Company could meet its loan covenants. Plaintiff alleges the Company should have disclosed that absent the scheme to manipulate the revolving credit line balance, the Company was in violation of those covenants. (AC, ¶ 449).

Plaintiff further contends that the Board of Directors had to be aware of these facts. For instance, the minutes of the Board meeting of December 17, 1999 (attended by all Individual

---

[40] The Court will address only new factual allegations pertaining to events during the Class Period or those which shed light on the scienter of Defendants at that time. The Court has not addressed the argument in this section regarding presentations made by Confidential Witness 3 to the Board in 1999, 2000 and March 2001 regarding the "Company's problems" with liquidity and working capital issues (*see, e.g.*, AC, ¶ 312) or the conclusions of the bankruptcy examiner's report regarding an actual or expected covenant default in the spring of 2000 (AC, ¶ 101) because these were addressed in *Payne*. Similarly, the Court is not considering the allegations concerning the "scheme and policy to manipulate the level of the revolver" carried out at the end of the first quarter of 2001 so that the Company could meet the debt leverage loan covenants (AC, ¶ 133) or DeLuca's sale of his Company stock in October-November 2001 (AC, ¶ 460), because these events occurred well after the Class Period and Plaintiff has made no allegations which tie those events to Defendants' knowledge at an earlier time.

43

Defendants), state that DeLuca and Soose "emphasized the goal of reducing debt by approximately $100 million to achieve compliance with the company's credit agreement loan covenants." (AC, ¶ 122).[41]  Only three months later, however, the Company increased its debt by $100 million rather than decreasing it by that amount.  Plaintiff concludes that "only willful blindness could obscure [the fact] that the Company was not in compliance with its loan covenants according to its true financial condition in the ordinary course of business." (*Id.*)  The fact that the Board discussed the requirements of meeting loan covenants in December 1999, then increased its debt in March 2000 does not necessarily lead to Plaintiff's conclusion.  That is, although each of the factual allegations may be true, his conclusion that the Individual Defendants must have known that the Company was in violation of its loan covenants simply because the Board members discussed the goal of meeting those covenants does not follow necessarily.

Plaintiff alleges that if the Company had used its average Revolver usage during each reporting period, it would have violated its loan covenants on a regular basis.  For instance, in the fourth quarter of 1999, the report to lenders stated that the Company – with a 4.32 leverage ratio[42] – was in compliance with its 4.5 loan covenant.  However, had the calculation been made using the quarterly average Revolver usage, rather than the artificially paid down balance, the leverage ratio

---

[41]  The Court is unable to identify these minutes within the exhibits provided by the parties.  In his brief, Plaintiff attempts to rely on a memorandum from DeLuca to the Board members dated January 31, 2000, referring to the discussion at the December 17, 1999 meeting.  (Declaration of Robert M. Zabb in Opposition to Motion to Dismiss First Amended Complaint, Docket No. 64, Zabb Decl., Exhibit C.)  The memorandum states:  "As discussed at the last Board meeting, the Company needed to pursue a near-term financing alternative to address liquidity and existing loan covenant constraints. . . . The new term debt will primarily be used to pay down the revolver and provide additional capacity for working capital purposes."  The Court declines to draw any inferences from this memorandum inasmuch as the January 31, 2000, memo is not mentioned in the Amended Complaint and was improperly submitted in response to the motion to dismiss.  *In re Burlington*, 114 F.3d at 1426 (the court may not consider documents extraneous to the pleadings except those which are "integral to or explicitly relied upon in the complaint").  As any arguments based on these exhibits are improperly raised in Plaintiff''s brief in opposition, the Court will disregard them for purposes of deciding the motion to dismiss.  *See In re PDI Sec. Litig.*, CA No. 02-211, 2005 U.S. Dist. LEXIS 18145, *48 (D. N.J. Aug. 17, 2005).

[42]  The leverage ratio is calculated by dividing total debt by EBITDA for the period.

would have been 4.52. (AC, ¶ 148). Building on this reasoning, Plaintiff further alleges that such a violation would have caused the Company to default on its loans. (AC, ¶ 31). That default in turn would have caused the principal of the loans to become immediately due. Consequently, the SEC filings violated GAAP because ITG failed to report its indebtedness as a current instead of a non-current liability on its balance sheets.

The Court finds these allegations insufficient to establish either misrepresentations or scienter on the part of any Defendant because the loan covenant violations alleged by Plaintiff are entirely hypothetical. The fact that the Board of Directors knew loan covenant violations were an ongoing *possibility* does not mean such violations *actually occurred*. There is no allegation that the lenders were unaware of or willfully ignored violations or failed to recognize that compliance was achieved only by accounting legerdemain. When the Company was in potential default of its loan covenants in December 2000 (eleven months after the end of the Class Period), it was forced to renegotiate the loan terms, a fact which was disclosed to the public in the Form 10-K issued on March 20, 2001. (Becker Decl., Exhibit K, at 17). As discussed in *Payne*, Plaintiff has not shown that the terms of any credit agreement required (or even permitted) loan covenant calculations to be made using the average Revolver usage rather than the amount outstanding at the end of the last day of the reporting period. (Becker Decl., Exhibit K, Form 10-K for 2000, Exhibit 10.11.2, Amendment No. 1 to the Second Amended and Restated Credit Agreement, December 21, 2000, at 6-8). Consequently, the alleged GAAP violations for reporting indebtedness as a current rather than non-current liability in the SEC filings are even more hypothetical.

3. *Misleading statements about the Company's financial condition in SEC filings and press releases:* Plaintiff contends that every SEC filing and press release issued during the Class Period was false and misleading because they incorporated the aforementioned accounting manipulations, or failed to disclose the Company's liquidity issues, thereby presenting a false picture of the Company's financial condition.

a. _Statements in SEC filings:_  Plaintiff's claims regarding false and misleading statements in the SEC filings issued between November 1998 when the Form 10-Q for the third quarter of 1998 was filed and February 23, 2000, the end of the Class Period, are exact duplicates of the claims made in _Payne_.[43]  For instance, Plaintiff contends that the Company's Form 10-Q for the third quarter of 1998, filed with the SEC on November 9, 1998, misrepresented the proportion of billed receivables to unbilled receivables and violated GAAP by including within accounts receivable some $18 million of claims and unapproved change orders that management believed were "probable of realization."  According to Plaintiff, ITG should have disclosed to the investing public -- as it did to its banks in the Monthly Compliance Letter Packages – (1) that its total receivables were not more than $230.6 million, (2) that the proportion of billed to unbilled receivables was heavily skewed toward the less collectible unbilled receivables, (3) that of the claimed receivables, $45 million consisted of unapproved change orders, (4) that the total receivables were "highly impaired" because of the Company's violation of pay-when-paid requirements, and (5) that the receivables were overstated because the amounts improperly included purchase price adjustments recorded during acquisitions as well as non-reimbursed cost overruns.  (AC, ¶¶ 187, 339-342).[44]   The Court need not revisit these arguments which were addressed throughout the _Payne_ Opinion and differ only as to the period in which the SEC filings were made.

---

[43]  Plaintiff also claims that the SEC filings violated 17 C.F.R. §229.303 and SEC Regulation S-K. _See Payne_, 433 F. Supp.2d at 574 n.25.

[44]  Other allegations of discrepancies between SEC filings and the Monthly Compliance Letter Packages are essentially the same as in _Payne_. _See_, _e.g._, allegations that the difference between total receivables reported in the 1998 Form 10-K and the total receivables reported in the Monthly Compliance Letter Package for the fourth quarter of 1998 included $55 million in unapproved change orders, therefore misleading investors not only as to quantity of receivables, but as to their quality inasmuch as billed receivables were overstated and unbilled receivables understated.  (AC, ¶ 171; _see also_ ¶ 173, making the same claim with regard to the Form 10-Q for the first quarter of 1999 and the April 28, 1999 Monthly Compliance Letter Package).  As stated above, there is no need to reconsider these allegations simply using data from the earlier period.

One matter not addressed in *Payne*, however, which Plaintiff contends is an example of improper accounting for accounts receivables, leading in turn to false and misleading information in the SEC filings, requires some discussion. Plaintiff claims that the Fernald project, part of the GTI Fluor Daniel acquisition in December 1998, "was known by Defendants to be a fiasco during the Class Period." (AC, ¶ 244). David Hill objected to the Company's recognition of revenues from the Fernald project, apparently in part because the customer had denied a $12.9 million change order in October 1998. Ernst & Young reported to the Audit Review Committee on October 20, 1999, that there was "still uncertainty" as to whether a revised change order would be accepted by the client. (AC, ¶ 242). As late as September 12, 2000, receivables on the Fernald project were still questionable and Plaintiff claims that until December 2000, the Company reported Fernald receivables separately from other billed receivables "because of their uncertain collectibility." (AC, ¶ 244.) A quarterly management package dated June 29, 2001, showed that all accounts receivable not categorized as "disputed" or from the Fernald project were included in billed accounts receivable in the SEC filings. (AC, ¶ 185, and Exhibit N). In December 2001, Defendants wrote off $1 million of Fernald receivables. Plaintiff claims that the magnitude of this write-off, "which [was] improperly delayed despite Defendants' close scrutiny of the situation, indicates scienter." (AC, ¶ 274 and Exhibit HH, noting that Fernald was written off as part of "cash acceleration strategy/timing of revenue recognition").

All that may be reasonably inferred from these allegations is that Fernald was a problem project and that Defendants were aware of that fact. Plaintiff's conclusion that the Company separately identified Fernald receivables because of "their uncertain collectibility" is sheer speculation because Plaintiff provides no factual support such as a statement by a confidential witness who was familiar with the Company's accounting practices. It is not even clear to the Court what fraudulent activity is being alleged in connection with the Fernald project, other than a delay in writing off the receivables. Although Plaintiff asserts that Fernald receivables totaled $33.2

47

million as of December 1999, \$32.4 million as of March 2000, \$28.7 million as of June 2000, and \$27.9 million as of September 2000, there is no allegation as to what part of those receivables should have been written down at a particular time. "[E]ven a delinquent write-down of the impaired assets, without anything more, does not state a claim of securities fraud, stating at best a bad business decision." *In re ICN Pharms., Inc. Sec. Litig.*, 299 F. Supp.2d 1055, 1065 (C.D. Cal. 2004). It appears that Plaintiff has simply identified a project with accounts receivable problems and set forth numerous financial facts about it, including internal reports that categorize its receivables in a way which differs from how those receivables are reported in the SEC filings. Although a plaintiff need not allege every individual improper transaction when stating a fraudulent accounting claim, the complaint must set forth enough information to allow the Court to determine if the alleged violations "affected the company's financial statements and whether they were material in light of the company's overall financial position." *Sparling v. Daou (In re Daou Sys. Sec. Litig.)*, 411 F.3d 1006, 1018 (9th Cir. 2005). Simply alleging that Fernald was a known fiasco does not state a claim for securities fraud.

For the reasons discussed in *Payne*, 433 F. Supp.2d at 590-597, the Court concludes that Plaintiff has failed to establish that any SEC filing prior to or during the Class Period contained material misrepresentations about the Company's financial condition.

   *b.*  *Statements in press releases:* Plaintiff contends that press releases issued on October 21 and October 28, 1998, and on February 23, March 3, April 12, April 21, May 11, May 17, May 27, July 21, and October 26, 1999, were all false and misleading for two reasons. First, they failed to disclose the problems with the acquisition program, namely, that the Company was having trouble covering the increased debt, the acquired companies were not producing adequate revenues and efficiencies, and the Company had violated GAAP by failing to make price adjustments at the time of acquisitions which should have resulted in write-downs of the receivables from the acquired companies. Second, the press releases were false and misleading

because they failed to disclose the Company's ever-increasing liquidity crisis. (See AC, ¶¶ 333-338, 347-353, 368-369; 373-374; 384-391 and 412-414).[45]

As a specific example, Plaintiff refers to the first of the press releases, dated October 21, 1998. He claims that the statement "an increase in the Company's revolving credit line of just $35 million [will] be sufficient to finance the Company's acquisition plans" was false and misleading "because the increase was due to IT Group's liquidity shortage, not merely to fund future cash needs." (AC, ¶¶ 333, 335-336). The press release actually stated:

> During the current quarter, the IT Group's bank syndicate increased the Company's Revolving Credit Facility by $35 million which, combined with management's ongoing working capital focus, is providing the Company with the liquidity needed to finance our growth and diversification plans in the near term.

(AC, ¶ 333).

Plaintiff has misstated the content of the press release by omitting the reference to "management's ongoing working capital focus" and the limitation of the increase to finance growth "in the [undefined] near term." Moreover, Plaintiff has failed to offer any factual allegation which would show that when DeLuca stated that the increase in the Revolver would be sufficient to provide the necessary "liquidity to finance our growth and diversification plans in the near term," he knew that statement was false. The revolving credit line had just been increased from $150 million to $185 million, the level at which it remained until the Company's bankruptcy in January 2002, more than three years after this statement was made. The Term C Loan was not acquired until March 2000, more than 15 months later, a time lapse that would put it outside "the near term." Even the fact that six months later, the Company issued $225 million of senior subordinated notes

---

[45] Plaintiff also refers to false and misleading press releases from February 24, 2000, through October 30, 2001; these have already been addressed in the Payne Opinion. The Court has declined to consider allegations based on certain press releases issued by Donaldson Lufkin & Jenrette on September 23, 1998, April 22, 1999, and August 26, 1999 (AC, ¶¶ 322, 370-372 and 402, respectively), CIBC World Markets Corp. on May 3, 1999 (AC, ¶ 375), and Salomon Smith Barney on November 4 and November 10, 1999 (AC, ¶¶ 415 and 428-429, respectively) because there is no allegation that any Defendant authorized these statements. See Payne, 433 F. Supp.2d at 588, n.38.

in order to finance two additional acquisitions can give rise only to a weak inference that DeLuca knew what he said was false because Plaintiff fails to show that those acquisitions were part of the Company's plans in late October 1998 or that the Company planned to issue the notes at the time the statement was made.

Plaintiff makes other unfounded leaps in basing certain allegations on these press releases. Referring to a press release dated February 23, 1999, he states: "[t]he claim that the Company had healthy liquidity based on free cash flow was false because the starting point for that measurement was earnings which included inflated receivables and various disputed claims for job change orders which were later written down by the Company." (AC, ¶¶ 347-351). However, a careful reading of that press release shows no reference to the Company's liquidity, healthy or otherwise. References to "a substantial growth in revenues and earnings" explicitly attributes that growth to the OHM and GTI acquisitions in 1998. Plaintiff's claim that these statements were false because earnings included "inflated receivables" and "various disputed claims for job change orders" does not satisfy the particularity requirement of the PSLRA inasmuch as he fails to offer even an estimate of the degree to which receivables were inflated at that time, the materiality of the disputed claims, or the source of these conclusions.

Another allegation, however, bears closer scrutiny. Plaintiff claims that in "approximately December 1999," DeLuca held a conference call with CIBC analysts in which he pointed to an "imminent" debt paydown, stating that the Company would reduce debt in the fourth quarter by $25 to $30 million.[46] Plaintiff describes this as a "complete fabrication," because DeLuca failed to

---

[46] In full, DeLuca is quoted as saying, "[w]hat I said in October is that our net debt pay down position in this quarter will be in the range of $25 to $30 million. That's from the free cash flow that we've produced in our business. It's also a combination of taking a very high revenue quarter and in some cases collecting the working capital investment we made in the quarter. But, we feel quite confident that we'll [produce] a new debt reduction . . . of $25 to $30 million in the quarter." (AC, ¶ 430). Plaintiff claims DeLuca had been promising investors that debt would be paid down in 1999, but although the Court can identify such puffing "promises" made in 2000 (e.g., the Form 10-K for 2000 states, "[w]e are focusing on reducing our leverage, and expect that during 2001 we will be able to reduce our total debt by $90—$100 million from our December 29, 2000 levels"), the Court has been unable to identify such a promise in any

50

disclose that he personally gave instructions to withhold cash payments due to vendors in the amount of $53 million. (AC, ¶¶ 430-431). This claim is directly supported by Confidential Witness 1 (CW 1) who was responsible for making payments by the Company. CW 1 stated that at the end of 1999, "as the situation became more desperate," he was given "strict instructions" by Defendants Soose and DeLuca to withhold $53 million in payments that were "supposed to be in the hands of vendors and subcontractors before the end of December. The checks were cut and placed in a drawer of the accounts payable department, but they were deliberately held back from going out before year's end." (AC, ¶ 146). Based on these allegations, one could reasonably infer that when DeLuca stated that the 1999 debt reduction would come from "free cash flow" in a "very high revenue quarter," he knew the paydown could only be accomplished by withholding payments to vendors. However, the inference cannot be considered strong because "in approximately December" is too vague to establish whether the statement was made before or after DeLuca told CW 1 to withhold payments. If, for instance, the statement was made before DeLuca realized that withholding payments was the only way to achieve the paydown, it would not have been false when made. And, as the Court noted in *Payne*, there is no allegation that the Company did not actually pay down its debt or that the Company did not generate sufficient operating cash flow to make such a reduction.[47]

_____

of the 1999 press releases and SEC filings provided by the parties. Neither paragraph 82 nor 142 of the Amended Complaint on which Plaintiff bases this statement in his brief in opposition to the motion to dismiss identifies such promises. In fact, as Plaintiff points out, the market reacted negatively to the announcement in March 1999 that the Company would acquire additional debt by issuing $225 million in unsecured notes and using the proceeds for more acquisitions and to refinance – not reduce – outstanding indebtedness, an action which would contradict any alleged "promise." (AC, ¶¶ 366-368).

[47] Operating cash flow for 1999 was $47 million, an increase of $62 million "principally due to improved operating results in 1999 and . . . also due to a $17 million net change in discontinued operations cash flow as a result of the 1999 release of previously restricted trust fund assets of discontinued operations." (Becker Decl., Form 10-K for 1999, Exhibit F at 22). Thus, it appears the Company had adequate cash flow to make the debt reduction. However, for purposes of deciding the motion to dismiss, the Court will accept Plaintiff's allegations that the reduction was achieved by delaying payments to vendors at the end of the year.

4.      *Failure to pay subcontractors and vendors on a timely basis and the Company's inability to abide by pay-when-paid regulations:*[48] As in *Payne*, Plaintiff argues that ITG misled investors and lulled them into complacency by failing to disclose the impact of the pay-when-paid regulations or their potential to impair government receivables, particularly because Defendants failed to disclose that a substantial portion of "cost-reimbursable projects unbilled" amounts included in billed receivables were subject to the pay-when-paid regulations.

Plaintiff argues that Defendants knew as early as March 1999 that vendors were not being paid. The failure to pay vendors in a timely manner, in turn, suppressed credit line usage, understated payables because checks recorded as paid were not sent to vendors, and hid the Company's liquidity problems from investors. To substantiate this allegation, Plaintiff relies on memoranda from March and October 1999, referring to contractors walking off the job as a result of not being paid.[49] These memos were addressed to the ITG Controller and Vice President of Procurement, who was a direct subordinate of Soose. (AC, ¶¶ 308-309 and Exhibits JJ and KK). The Court finds these documents do not lead to a strong inference of scienter on the part of any

_____

[48]  Plaintiff's argument that the Company failed to advise investors of the existence and consequences of the federal government's pay-when-paid regulations was addressed at length in *Payne*, 433 F. Supp.2d at 600-603.

[49]  Plaintiff has also offered as evidence that all Defendants knew about the failure to pay vendors a March 9, 2001, memorandum from DeLuca to members of the Board of Directors which states in relevant part that \$34 million of a \$57 million increase in net debt between December 2000 and February 2, 2001, was "primarily related to the use of cash for vendor payments which had been delayed to 2001." (AC, ¶ 121 and Exhibit E). The reasonable inference to be drawn from this memo is that to the extent this delay in payments to vendors was somehow fraudulent, the fraud occurred in the fourth quarter of 2000. That is, this memo is not evidence that any Defendant, including DeLuca, was aware that vendor payments were being delayed within the Class Period which ended almost eleven months before. Similarly, the statement by Confidential Witness 3 that during "the last six months before Shaw took over the Company's businesses," all of his time was spent "fending off unpaid vendors, collecting cash, setting up accounts with customers to get cash, and bringing in new vendors to replace those who had walked off the job" (AC, ¶ 310), would have applied to events in late 2001. His comment that nonpayment of vendors was "an ongoing problem while [he] was at IT Group" is too vague to give rise to an inference of scienter on the part of any Defendant. The November 13, 2000, memorandum from Conte to Defendants DeLuca and Soose noting that accounts payable after July 11, 2000, had not been paid (AC, ¶ 130 and Exhibit F at PL 10) does not lead to an inference that during the Class Period, such a practice had occurred or that Defendants knew about it.

52

Defendant, even Soose. First, knowledge of a subordinate cannot, without more, be imputed to a securities fraud defendant. *In re Bio-Technology Gen.*, 380 F. Supp.2d at 596. Second, in the October 26, 1999 memorandum, the Vice President of Procurement assures the writer of the complaint that he will copy the memo to "senior managers," stating, "I think it will be helpful for them to see this message." (AC, Exhibit KK). Significantly, however, the list of recipients does not include any Defendant; therefore, there is no evidence that any of them was aware of its content, even if their subordinates received it.

Plaintiff's claims that the Board members knew about non-payment of vendors rest largely on events which occurred well after the Class Period. One exception – a memorandum from DeLuca to the Board dated April 19, 1999, referring to "our tight liquidity plan which delayed vendor payments and related billing on federal government contracts" – will not be considered by the Court because the Amended Complaint does not mention or rely on this document or DeLuca's statement. (*See* note 40, *supra*). Nor do the allegations based on statements by Confidential Witness 3 regarding presentations to the Board "from 2000 on" in which he "laid out the Company's problems," including "subcontractors walking off the job, . . . unpaid vendors filing liens, . . . problems with getting bonding for the Company's projects due to its negative history with respect to late payment of vendors" (AC, ¶¶ 310-316) establish scienter. Again, accepting the vague allegation that "from 2000 on" means that Defendants were aware of the non-payment problem during the Class Period herein, that does not necessarily lead to the inference that this information was fraudulently withheld from the public. "Except for specific periodic reporting requirements . . . . there is no general duty on the part of a company to provide the public with all material information." *In re Burlington*, 114 F.3d at 1432. In fact, a defendant is not required "to disclose a fact merely because a reasonable investor would like to know that fact." *Id., quoting In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993); *see also Basic, Inc.*, 485 U.S. at 239, n.17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5"). Plaintiff has cited no

53

support for his contention that these problems should have been disclosed to the public.

Another new allegation on this topic which did not appear in the *Payne* SAC is based on a

January 2002 report by Conway, Del Genio, Gries & Co., LLC, entitled "Draft Report to the Senior

Secured Lenders of the IT Group, Inc."   The report sets out the "extreme problems" which would

result if the company violated the pay-when-paid rules.  Plaintiff alleges that the report[50] states the

following material facts which were not disclosed by ITG:

- IT was operating under a compliance program as a result of OHM's pre-acquisition violation of billing/payment practices;

- "Compliance matters" included ITG's pay-when-paid status with its subcontractors on government work; and

- Potential penalties for violation of the pay-when-paid regulations include (1) a significant increase in working capital requirements because the Company would need to fund payment to subcontractors prior to collection of the related government receivable and (2) suspension of new work being awarded to ITG.

(AC, ¶ 209).

As discussed in *Payne*, 433 F. Supp.2d at 602-603, investors would have been aware of

the pay-when-paid regulations and the implications of failing to comply with them because such

government regulations were in the public domain and the Company was under no obligation to

provide investors with information about the regulations because they were not "firm specific."  *See*

*Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1143 (9th Cir. 1996). Moreover, this excerpt from

a report by an external analyst   issued in January 2002 sheds no light on what any Individual

Defendant may have known about alleged pay-when-paid violations between July 1999 and

February 2000.

Embedded within the above-cited report, however, is an allegation which was not addressed

in the previous analysis of the pay-when-paid regulations.  That is, Plaintiff alleges the Company

---

[50]  Neither party provides a copy of the full report; the Court therefore accepts as accurate the excerpts provided by Plaintiff.

54

failed to disclose that it was operating under a compliance program as a result of OHM's pre-acquisition violation of billing/payment practices.[51] (AC, ¶ 209). The fact that the Company was operating under such a program would be a firm-specific aspect of the regulations which, pursuant to *Epstein, supra*, it was obliged to disclose.

A review of the Form 10-K for 1998, released on March 22, 1999, shows it simply is not true, however, that ITG failed to disclose this information to investors. The Company stated the following in the section addressing risks associated with its role as a government contractor:

On or about September 2, 1998, OHM Corporation, one of its subsidiaries, and The IT Group entered into a Compliance Agreement with the EPA to address alleged past practices by OHM that, according to the EPA, may constitute a basis for our suspension and/or debarment. A breach of the Compliance Agreement by us or any of our subsidiaries is potentially cause for our immediate suspension from work and/or debarment.

(Becker Decl., Exhibit G, at 17-18).

The same statement is made in the 10-K for 1999, with the additional information that "[w]e have not received any notice of noncompliance regarding the September 2, 1998 Compliance Agreement and believe OHM and The IT Group have been compliant." (Becker Decl., Exhibit F, at 11). A similar notice appears in the 10-K for 2000. (Becker Decl., Exhibit K, at 9). Thus, the allegation that ITG failed to disclose an aspect of the pay-when-paid regulations which was particular to itself is unfounded.

Finally, Conte stated that Messrs. DeLuca and Soose knew about the pay-when-paid regulations and "expressed concern about the Company's compliance with those rules." When asked what they had said on the subject, Conte testified, "[t]hey were very concerned. They knew what the rules were. They knew that they had to try to live with them." (AC, ¶ 210). Similarly, CW1

---

[51] Since this allegation appears in a section of the Amended Complaint which addresses only the pay-when-paid regulations and there are no allegations elsewhere concerning violation of other government "billing/payment practices," the Court assumes that the violation in question is associated with the pay-when-paid regulations.

said that the daily liquidity position memos provided to Defendants Soose and DeLuca included information about payments necessitated by the regulations and that weekly cash flow projections prepared by the finance department in which CW1 worked identified amounts which had to be paid under the regulations. (AC, ¶ 211). Plaintiff alleges that the members of the Board of Directors knew ITG was required to comply with the pay-when-paid requirements and discussed this issue at Board meetings. For instance, a financial report provided to the Board at its meeting of June 8, 2000, mentions that "an emphasis on reducing working capital includes a pay when paid initiative." (AC, ¶ 213).

The Court accepts all of Plaintiff's allegations as true. However, neither the fact that Messrs. Soose and DeLuca knew the effect of violating the pay-when-paid regulations and how much was needed on a weekly basis to satisfy them, nor the fact that the members of the Board discussed the regulations, suggests that the regulations were violated during the Class Period. The bankruptcy examiner's report on which Plaintiff relies[52] states that "during the last quarter of 2001, [ITG was] no longer able to invoice the federal government on a significant portion of contract work because [it] could not certify that the subcontractors were current with respect to all prior payments due." (AC, ¶ 205). Because it identifies a time period in which the Company "no longer" met the regulation, this allegation leads to the reasonable inference that during the Class Period, which ended almost two years before, ITG had been able to satisfy those requirements.

5. *Misrepresentations as to the value and reliability of the ITG contract backlog:* Plaintiff makes essentially the same claims and arguments as those in *Payne* with regard to the Company's contract backlog, *i.e.,* that Defendants misrepresented or failed to disclose to investors that: (1) a substantial part of its backlog of government contracts was known to be unprofitable

_____

[52] *See, e.g.,* AC, ¶¶ 17, 21, 90, 98, 101, 104-105, 204-205, 221, 229, and Becker Decl., Exhibit J, First Report of R. Todd Neilson, as Examiner for the IT Group, Inc., *et al.*, Pursuant to Order of Appointment, dated March 11, 2002.

and/or would be realized only five or more years in the future; (2) contrary to statements in its SEC filings, the Company did not "bid selectively on new work," but instead "accepted a number of projects which were either low margin or unprofitable;" and (3) ITG was not always the sole successful bidder on indefinite delivery order ("IDO") contracts awarded by the federal government, but rather, multiple contractors, each of whom could do the work required, were typically identified as successful bidders. (AC, ¶¶ 277-280).[53]

Plaintiff raises very few new substantive issues about the contract backlog and the alleged misrepresentations on this subject which were not previously considered in the *Payne* Opinion.[54] Plaintiff notes that on September 23, 1998, Donaldson, Lufkin & Jenrette (DLJ) issued an analyst's report, raising its rating on IT Group to "buy," based in part on the Company's purported backlog. Consequently, the Company's misrepresentations on this subject were material and served to materially artificially inflate the price of IT stock. (AC, ¶ 332). He claims that the Company's press releases during the Class Period also presented false and misleading information about the backlog. For instance, the October 21, 1998, press release included false reassurances that investors could rely on the Company's large contract backlog. (AC, ¶ 333). Plaintiff claims the press release failed to disclose that the purported backlog was not exclusive to ITG and could be assigned to other vendors. (AC, ¶ 335; *see also* ¶ 350, alleging that a press release regarding 1998 results, issued on February 23, 1999, contained the same false and misleading omissions). The Company's SEC filings during the Class Period were similarly false and misleading because they failed to disclose the quality of backlog revenues, the likelihood of losses from low-margin or unprofitable backlog projects, the time lag in receiving backlog revenues, and the potential for parts

---

[53] Other new allegations of misrepresentations concerning the Company's contract backlog appear at AC, ¶¶ 344, 350, 362, 374, 381, 391, 399, 408, 414, and 425.

[54] Plaintiff reiterates the same allegations which were made in *Payne* regarding a presentation made by DeLuca on April 14-15, 1999, press releases issued during the Class Period herein, SEC filings, and statements by confidential witnesses. *See, e.g.*, AC, ¶¶ 296, 324, 328, 370-371, 435, and 453-455.

of the claimed backlog to be transferred to other contractors. (See, e.g., AC, ¶ 344, discussing Form 10-Q for the third quarter of 1998).[55]

In short, the Court concludes – for the reasons discussed at length in Payne – that Defendants adequately distinguished between funded and unfunded portions of the backlog in the Company's SEC filings, that the market would have known how IDO contracts are awarded, and that statements about the reliability of the backlog were either forward-looking statements protected by the Reform Act's safe harbor provision or inactionable puffery. Payne, 433 F. Supp.2d at 603-606. Plaintiff has failed to show that the statements made by DLJ in September 1998 can be attributed to any Defendant. (Id. at 588, n.38). Thus, claims of securities fraud resting on purported misrepresentations about the Company's backlog must be dismissed.

D.      Loss Causation[56]

Pursuant to Dura, plaintiffs in a securities fraud case brought under Section 10b(5) must allege both economic loss and "a causal connection between the material misrepresentation and the loss." Dura, 544 U.S. at 342. As noted in Payne, the allegations regarding loss causation therein reflected almost exactly the language the Supreme Court rejected in Dura[57] where the

---

[55] Plaintiff also alleges that additional facts about IDO contracts and the backlog were confirmed in the report prepared in January 2002 by Conway et al. for the Company's senior secured lenders in the bankruptcy process. The report, which relied on unaudited financial information, Company records and forecasts, and discussions with its management, indicated that approximately 38% of projected 2002 revenue was related to funded backlog, 52% to unfunded backlog, and 11% to anticipated new work. It also noted the tenuous nature of IDO projects. (AC, ¶ 281). The Court need not consider this allegation further because it addresses events which occurred some two years after the end of the Class Period and relates to projected backlog revenues for 2002 which is not relevant to the claim that information about the backlog provided in the past was false and misleading.

[56] See Payne at 433 F. Supp.2d at 606-611 for a summary of the Supreme Court's analysis in Dura, as well as a discussion of the ITG announcements made between October 30 and December 27, 2001, which were analyzed pursuant to the "corrective disclosure" paradigm of alleging loss causation.

[57] In Dura, the plaintiffs alleged that the defendant pharmaceutical company misrepresented the company's profitability and the expected approval of its new asthmatic spray device by the FDA. In reliance on those statements, plaintiffs purchased Dura stock, only to learn, first, that earnings would be lower than expected due in part to slow drug sales, and second, that the FDA would not approve the device. Dura, 544 U.S. at 339. Plaintiffs sued Dura, its managers and directors under the PSLRA, invoking the fraud-on-the-market doctrine. The District Court dismissed the case, finding that the

plaintiffs had alleged "the following (and nothing significantly more than the following) about

economic losses attributable to the . . . misstatement: 'In reliance on the integrity of the market, [the

plaintiffs] paid artificially inflated prices for Dura securities' and the plaintiffs suffered damage[s]

thereby.'" *Dura*, 544 U.S. at 339-340. The Supreme Court held that to successfully allege a cause

of action in a fraud-on-the-market case, a plaintiff must allege that the share price fell significantly

after the truth about the misstatement or omission became known, which the *Dura* plaintiffs had

failed to do. *Id.* at 347.

Here, Plaintiff alleges that he "purchased shares of [ITG] common stock during the Class

Period and was damaged thereby." (AC, ¶ 42). He further alleges:

> In ignorance of the adverse facts concerning [ITG's] business operations and earnings, and in reliance on the integrity of the market, plaintiffs [sic] and the members of the Class acquired [ITG] common stock at artificially inflated prices and were damaged thereby.
>
> Had plaintiffs [sic] and the members of the Class known of the materially adverse information not disclosed by the Defendants, they would not have purchased [ITG's] common's stock at all or not at the inflated prices paid.

(AC, ¶¶ 480-481).[58]

---

complaint failed to adequately allege scienter or loss causation. *Id.* at 340. The Ninth Circuit Court of Appeals held that because the injury occurred when the plaintiffs purchased their stock at prices which were inflated by the corporation's misrepresentations, the plaintiffs had satisfied the loss causation requirement. The Supreme Court reversed, finding that the plaintiffs failed to adequately allege proximate cause. *Dura*, 544 U.S. at 346. Specifically, the Supreme Court held that a plaintiff cannot satisfy the loss causation requirement of Section 10(b) by simply alleging that the purchase price of the security on the date of purchase was inflated because of the misrepresentation. *Id.* at 342. The Court reasoned that when the plaintiffs purchased Dura's shares, they did not immediately suffer a loss because they could have sold the shares at an equally inflated price any time before the truth became known. That is, an inflated purchase price "will not itself constitute or proximately cause the relevant economic loss. . . . [I]f the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." In a fraud-on-the-market situation, the loss does not occur until the truth becomes known to the public, causing the share value to drop and preventing the plaintiffs from recouping the purchase value by re-selling the shares. *Id.* at 342-343. Thus, to successfully allege a cause of action, a plaintiff must allege that the share price fell significantly after the truth about the misstatement or omission became known. *Id.* at 347.

[58] While these allegations may support the reliance or transaction causation element of a securities fraud claim, they do not satisfy the loss causation element. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001) (associating transaction causation with the idea that "but for the fraudulent misrepresentation, the investor would not have purchased or sold the

These allegations are a verbatim duplication of the language used in the Second Amended

Complaint in *Payne*.[59]  Moreover, there is no mention of those members of the putative class who

purchased the senior subordinated notes, not common stock.  Loss causation is never explicitly

mentioned in the Amended Complaint, although it was filed well after the Supreme Court's opinion

in *Dura*, which clearly states that loss causation is one of the "basic elements" to be alleged in

securities fraud cases.  *Dura*, 544 U.S. at 341.  Plaintiff does not even make a generic allegation

that Defendants' misrepresentations "directly or proximately caused, or were a substantial

contributing cause of, the damages [he] sustained."  *See Semerenko v. Cendant Corp.*, 223 F.3d

165, 186 (3d Cir. 2000).  However, Plaintiff does allege:

> The market experienced a severe reaction to the adverse developments between
> October 30, 2001 and January 16, 2002.  The value of IT Group stock evaporated.
> In trading on October 30, 2001, when the news release on third quarter results was
> dated, the price of IT shares dropped from $4.77 to $3.48, a 27.04% loss.  As the
> company held its corresponding conference call on that release and the Salomon
> Smith Barney analyst's report on that release occurred, the stock dropped from a
> $3.50 close on November 2, 2001 to a close of $1.65 on November 8, an additional
> 53% plunge.[60]  When IT announced the suspension of its dividend on its preferred
> shares, the price resumed its drop from a close of $1.73 on November 29, 2001 to

security.")

[59] The Second Amended Complaint in *Payne* was filed before the Supreme Court decided in *Dura*, but before the parties had completed briefing the issues raised in the motion to dismiss.  Neither party, however, addressed the loss causation element in their pleadings despite the obvious applicability of that case, nor did the plaintiffs seek to amend the complaint to satisfy the pleading requirements of *Dura*.  However, the Court analyzed the Second Amended Complaint in light of *Dura*, and found that the plaintiffs had failed to adequately plead loss causation.  In short, the Court concluded that although the plaintiffs had alleged the price of ITG stock fell severely between October 30, 2001, and January 16, 2002, as the Company released its dismal results for the third quarter of 2001, announced that it would suspend payment of its dividend on preferred shares, alerted the market that it expected to file for bankruptcy, and eventually did so, none of these announcements revealed any part of Defendants' fraudulent actions, but instead perpetrated the cover-up.  Moreover, the *Payne* plaintiffs had clearly alleged that they first learned of the defendants' wrongdoing from documents filed in ITG's bankruptcy proceeding "no earlier than March 2002" and that further facts were revealed in a bankruptcy examiner's report filed in the same proceedings "on or about April 2002."  The Court concluded that if the *Payne* defendants' wrongdoing was not disclosed until March 2002 at the earliest, the plaintiffs had failed to satisfy the *Dura* requirement of pleading that the decline in the price of ITG stock was the result of the truth surrounding the defendants' fraud becoming known to the public.

[60] The contents of the press release of October 30, 2001, and the Salomon Smith Barney analyst's report issued on November 3, 2001, are not alleged in the Amended Complaint.

a closing price of $.81 on December 3, 2001, a loss of over 50%. By December 27, 2001, when the Company announced it expected to file for bankruptcy, IT [Group] lost almost all value, plummeting again from a December 26 closing price of $.38 to a price of $.05 at the market close on December 28, 2001, when the Company said they may be forced to file bankruptcy.

Similarly, IT Group's $225 million notes were downgraded at the end of the Class Period as the bad news emerged about IT Group's financial condition. Standard & Poor's downgraded its rating on the bonds from B+ at time of issuance to B as of November 20, 2001, B as of December 3, 2001, CCC+ as of December 14, 2001, C as of December 27, 2001, D as of January 16, 2002 and not rated as of February 10, 2002. Moody's downgraded the bonds from B3 as of date of issuance to Caa3 as of December 13, 2001 to withdraw rating as of January 18, 2002. As the bad news emerged and these bonds were downgraded, their market price declined, causing damages to members of the Class.

(AC, ¶¶ 469-470).

Defendants argue that Plaintiff has not adequately pled loss causation for two reasons. First, he cannot establish a causal connection between a purported misrepresentation and his loss inasmuch as ITG's stock price declined before any alleged misrepresentations were disclosed. Second, the disclosures which did take place between October 2001 and February 2002 related to ITG's worsening financial condition and eventual bankruptcy, but did not reveal that any statements made during the Class Period were false. In short, Defendants argue that Plaintiff has failed to identify a "corrective disclosure" which brought to light the alleged fraudulent activities and caused a drop in the value of the securities.

Plaintiff argues that he has adequately pled loss causation not by alleging a corrective disclosure, but by pointing to the materialization of a concealed risk. That is, throughout the Class Period and thereafter until the last quarter of 2001, Defendants successfully hid the Company's lack of liquidity from the investing public. This chronic liquidity crisis put the Company at risk of bankruptcy and/or inability to service its debt. In late 2001, the Company was forced to concede that it had massive amounts of uncollectible accounts receivable which finally had to be written-off and had run out of borrowing capacity to supplement its rapidly declining revenues. Defendants could no longer keep the Company afloat by dishonestly suppressing the balance on the revolving

loan in order to meet loan covenants, delaying payments to vendors, and engaging in other accounting manipulations. Thus, the risks associated with the concealed chronic liquidity crisis materialized and the Company stock lost its all its value. The Court disagrees.

Although the Third Circuit has held that loss causation is a fact-intensive inquiry best resolved by the trier of fact (see EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 884 (3d Cir. 2000)), the plaintiff must provide the defendant "with some indication of the loss and the causal connection that he has in mind." Dura, 544 U.S. at 347; see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 198 (2d Cir. 2003) ("the very question" the loss causation allegation must answer is why plaintiffs lost money on the purchase).

In making his argument that he has properly pled loss causation through allegations showing that the risks associated with the prolonged liquidity crisis materialized and caused his loss, Plaintiff relies almost entirely on cases from the Second Circuit.[61]  To date, the Third Circuit has not explicitly addressed the materialization of the risk method of pleading loss causation,[62] nor

_____

[61]  See Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 174 (2d Cir. 2005); Emergent Capital, 343 F.3d at 197; Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 98, n.1 (2d Cir. 2001); Catton v. Defense Tech. Sys., Inc., CA No. 05-6954, 2006 U.S. Dist. LEXIS 205, *20-*22 (S.D.N.Y. Jan. 3, 2006); Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., CA No. 05-1898, 2005 U.S. Dist. LEXIS 19506, *57-*58 (S.D.N.Y. Sept. 6, 2005); In re Initial Public Offering Sec. Litig., 399 F. Supp.2d 298, 307 (S.D.N.Y. 2005); and In re NTL, Inc. Sec. Litig., CA No. 02-3013, 2006 U.S. Dist. LEXIS 5346, *30-*33 (S.D.N.Y. Feb. 14, 2006).

[62]  The Third Circuit Court of Appeals has addressed the Second Circuit standard for alleging loss causation on at least one occasion, albeit in dicta. In Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 181, n.24 (3d Cir. 2001), the plaintiffs, relying on AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202 (2d Cir. 2000), argued that they had established loss causation because it was foreseeable the defendants' trading practices would cause economic harm to class members. The Third Circuit Court of Appeals explained that the Second Circuit's definition of loss causation "examines how directly . . . [the fraudulent conduct] caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent [conduct]." Newton, id., also citing Suez Equity Investors, 250 F.3d at 96.  The Court went on to state:

Our test for loss causation is framed somewhat differently. . . . [A] viable Rule 10b-5 securities claim must show a "sufficient causal nexus between the loss and the alleged [nondisclosure]." Semerenko, 223 F.3d at 184.  In other words, to establish loss causation, a claim must demonstrate that the fraudulent conduct proximately caused or substantially contributed to causing plaintiff's economic loss.  Whether there are differences between these standards for loss causation, it is far from certain in this case that each plaintiff has sustained a loss, unlike the insurance companies in AUSA.

has it analyzed the language in *Dura* requiring a plaintiff to allege that "the share price fell significantly after the truth about the misstatement or omission became known." *Dura*, 544 U.S. at 347. However, accepting Plaintiff's contention that materialization of the risk is an acceptable alternative means to plead loss causation in this Circuit, the Court finds that he has failed to meet the standards set out in the cases on which he relies.

There are two methods of establishing loss causation, which have been distinguished as follows:

> Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss. By contrast, where the alleged misstatement is an intentionally false opinion, the market will not respond to the truth until the falsity is revealed, i.e, a corrective disclosure.

*In re Initial Public Offering Securities Litig.*, 399 F. Supp. 2d 298, 307 (S.D. N.Y. 2005).

Relying on *In re Parmalat Sec. Litig.*, 375 F. Supp.2d 278, 307 (S.D. N.Y. 2005), Plaintiff argues that even though the true extent of the fraud was not disclosed until two months after the ITG stock price plummeted in late 2001 and the notes were downgraded, that disclosure is immaterial where the risk concealed by Defendants materialized and caused the decline in the value of the securities. As was the case in *In re Parmalat*,[63] Plaintiff claims that lack of liquidity caused ITG to file for bankruptcy and the Company's bonds were downgraded when the details of the Company's perilous financial condition were revealed beginning in late 2001. Thus, he contends, he has satisfied the loss causation requirement under the materialization of the risk theory.

According to the Second Circuit's decision in *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161

---

*Newton*, *id.* (other internal citations omitted.)

[63] *In re Parmalat* involved claims against auditing company defendants who concealed the Italian dairy conglomerate's massive undisclosed debt, its inability to service that debt, and its reliance on non-existent bank accounts to bolster its reported assets. *Id.*, 375 F. Supp.2d at 307.

(2d Cir.), cert. denied, ___ U.S. ___, 126 S.Ct. 421 (2005), a plaintiff relying on the materialization of the risk method must allege several things.[64]  First, he must establish that the misstatement or omission was the proximate cause of his loss by alleging that the loss "was within the zone of risk concealed by the misrepresentations and omissions."  He must further allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Otherwise the loss in question was not foreseeable." Third, he must assert "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." Lentell, 396 F.3d at 172-73.  If the relationship between his investment loss and the information misstated or concealed by the defendant is sufficiently direct, he has satisfied the element of loss causation for purposes of withstanding a motion to dismiss. Id. at 174.

The first step, therefore, in analyzing whether a plaintiff alleging securities fraud has adequately pled loss causation "is to identify the subject of the misrepresentations or omission that allegedly caused plaintiff's loss, i.e., the risk concealed by the defendant's fraud." Leykin v. AT&T Corp., 423 F. Supp.2d 299, 240 (S.D. N.Y. 2006); see also Halperin v. Ebanker Usa.com, 295 F.3d 352, 359 (2d Cir. 2002).  The second step "is to determine whether the complaint alleges that the concealed risk led to plaintiff's loss. . . .  If the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." Leykin, id. (internal quotation omitted).

The threshold problem with Plaintiff's argument that the undisclosed risk was the Company's chronic liquidity crisis is that herein, unlike In re Parmalat, contemporaneous public statements repeatedly revealed the Company's liquidity situation.  In its 1998 Form 10-K, for example, the Company advised investors of its intent to issue $200 million in senior subordinated

---

[64] The Second Circuit's decision in Lentell was issued on January 20, 2005, shortly before the Supreme Court's decision in Dura on April 19, 2005.  In denying the petition for writ of certiorari on October 25, 2005, the Supreme Court did not offer any comment on the analysis in Lentell vis-a-vis its holding in Dura, nor did it remand Lentell for further consideration in light of Dura.

notes in order to finance two imminent acquisitions (Note Offering) (Becker Decl., Exhibit G, at 6-

7). The Form 10-K later reported in a section entitled "Substantial Leverage" that total

indebtedness as of December 25, 1998 was $422,662,000. The statement continued, "we have

now and, after the Note Offering, will continue to have a significant amount of indebtedness." (*Id.*

at 19). This section continued:

> Our substantial indebtedness could have important consequences. For example, it could:
>
> – increase our vulnerability to general adverse economic conditions;
>
> – limit our ability to pursue our acquisition business strategy;
>
> – limit our ability to obtain necessary financing or bonding, fund future working capital, capital expenditures and other general corporate requirements
>
> **– require us to dedicate a substantial portion of our cash flow from operations to payments on our indebtedness, thereby reducing the availability of our cash flow to fund working capital, capital expenditures and other general corporate purposes;**
>
> – limit our flexibility in planning for, or reacting to, changes in our business and the environmental services industry;
>
> – place us at a competitive disadvantage compared to our competitors that have less debt; and
>
> **– limit, along with the financial and other restrictive covenants in our indebtedness, our ability to borrow additional funds. And, failing to comply with those covenants could result in an events of default which, if not cured or waived, could have a material adverse effect on us.**
>
> We may be able to incur substantial additional indebtedness in the future. During 1998, we amended and restated our credit facilities so that they now provide for a $228.0 million eight-year term loan and a $185.0 million six-year revolving credit facility. At December 25, 1998, we had outstanding $225.8 million of borrowings under the term loan and $143.0 million under the revolving credit facility. **If new debt is added to our current debt levels, the related risks that we now face could increase.**

(Becker Decl., Exhibit G, at 20, emphasis added).

As if the foregoing were not warning enough, the Form 10-K continued in a section entitled

65

"Ability to Service Debt:"

Our ability to make payments on and to refinance our indebtedness and to fund planned capital expenditures and any future acquisitions will depend on our ability to generate cash in the future. Our success is dependent upon our results of operations, which are heavily dependent on various factors, including managing utilization of our professional staff, properly executing projects and successfully bidding new contracts at adequate margin levels. . . .

Based on our current level of operations and anticipated costs savings and operating improvements, we believe our cash flow from operations, available cash and available borrowings under our credit facilities will be adequate to meet our future liquidity needs, excluding acquisitions, for the next twelve months.

**We can make no assurance, however, that our business will generate sufficient cash flow from operations or that future borrowings will be available to us under our credit facilities in an amount sufficient to enable us to pay our indebtedness or to fund our other liquidity needs.**

(Becker Decl., Exhibit G, at 20, emphasis added).[65]

In the Form 10-K for 2000, released on March 20, 2001, the Company stated that in

December 2000,

we requested . . . an amendment to the credit agreement for the exclusion of the special charge from our covenant ratio calculations and revisions to the financial covenants which included, among other items, the deferral of more restrictive future financial covenants for maximum EBITDA, minimum interest coverage and minimum fixed charge coverage, as defined, to later quarters over the next two years. As amended, we were compliant with the covenants and all other limitations of our credit agreement at December 29, 2000.

(Becker Decl., Exhibit K, at 17).

Such requests, coming only nine months after the Company had taken on an additional

$100 million loan, alerted the market that ITG must have experienced difficulty meeting its loan

covenants during the last quarter of 2000 if not before and that the Company would have failed to

comply with its loan covenants had the credit agreement not been amended.

The Company revealed in its Form 10-Q for the third quarter of 2001 that it anticipated it

---

[65] The foregoing caveats cited as appearing in the Form 10-K for 1998 were repeated, essentially verbatim, in the Form 10-K for 1999, Becker Decl., Exhibit F, at 8-9, released on March 30, 2000.

would not meet the more restrictive covenants in effect as of September 2001 and again sought modification of those covenants. (Becker Decl., Exhibit N, at 11). It also warned investors that it expected to negotiate a third amendment during the first quarter of 2002, another sign that the Company did not expect its liquidity situation to improve in the near future. *Id.*

Apparently recognizing that these disclosures hamper his materialization of the risk argument, Plaintiff asserts that the materiality of Defendants' concealment of this long-term, pervasive liquidity problem is overwhelming and cannot be dispelled by indirect or partial disclosures. Relying on *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 209 (1st Cir. 2005), Plaintiff argues that even honest disclosures of liquidity problems cannot necessarily, as a matter of law, redress earlier false claims of adequate liquidity, since pervasive liquidity problems are qualitatively different from a sudden temporary reversal. Moreover, no "honest disclosures" were ever made regarding ITG's long-term liquidity problem.

It is undoubtedly true that cautionary language in securities publications, such as those which appear in the Company's SEC filings, "is just about universal." *Halperin*, 295 F.3d at 359. To overcome the effect of such general language, the plaintiff may show that the "cautionary language did not expressly warn of or did not directly relate to the risk that brought about [his] loss." *Id.* But other than the blanket argument just above, Plaintiff never explains why the cautionary language in the SEC filings did not constitute "honest disclosures" of the Company's "long-term, pervasive liquidity problem." [66]

Furthermore, the Court finds the disclosures herein were neither indirect nor partial. Unless

---

[66] In *Payne*, the plaintiffs claimed that ITG became secretly insolvent in February 2000. The Court noted that because the Company continued to operate until February 2002 without seeking bankruptcy protection, it was reasonable to infer that although for most of that time liquidity was a problem, there was no "crisis" to disclose. *Payne*, 433 F. Supp.2d at 592-593, *citing In re Ultrafem Sec. Litig.*, 91 F. Supp.2d 678, 700 (S.D. N.Y. 2000). Since Plaintiff here alleges that the crisis began in 1998 with the acquisition of OHM, that conclusion is reinforced since under Plaintiff's timetable, ITG managed its liquidity problem for almost four years.

investors expected the Company to announce explicitly in every public statement that it might, someday, declare bankruptcy, it is difficult to imagine what more it could have done to alert the market to its ongoing liquidity situation and the consequences thereof.  As noted previously, at the same time the Company advised investors that if it took on additional debt, the associated risks could increase, it stated that it was about to do just that.  Within a year of issuing $225 million in notes and borrowing another $100 million on the Term C Loan, the Company had to amend its credit agreements in order to comply with its then-current loan covenants and request postponement of more onerous covenants.  As Plaintiff points out, the Company was unable to make appreciable progress in reducing its total debt.  The situation never significantly improved and Defendants never asserted to investors that it had.  In stark contrast to the facts of *In re Parmalat*, this "massive" debt and the Company's potential inability to effectively service it were repeatedly disclosed.

As the Second Circuit stated in *Lentell*:

> where (as here) substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk, a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud – rather than other salient factors – that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment.

*Lentell*, 396 F.3d at 177.

The Court finds that Plaintiff has failed to state allegations in the Amended Complaint that would satisfy either of these *Lentell* criteria.[67]  There are no allegations that Defendants' fraudulent

---

[67]  Contrary to Plaintiff's argument that one reason Defendants' motion to dismiss should be denied is their failure offer evidence that intervening events were at least partially responsible for the decrease in value of ITG securities, *Lentell* makes clear that the burden is on the plaintiff to plead that its loss was caused by fraud and not intervening events. "When the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately [pled] facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events." *Lentell*, 396 F.3d at 174 (internal quotations omitted). In addition to the impact of September 11, 200, on the financial markets, "[as] is obvious to anyone familiar with recent history, America's economy underwent a recession and the U.S. stock market suffered a substantial decline

concealment of the Company's liquidity crisis proximately caused his loss. The closest Plaintiff comes to such a statement is the allegation that his "case is based upon the concealment of the Company's liquidity and related problems, and the means utilized by Defendants to artificially prop up the failing Company." (AC, ¶ 8). Elsewhere, he states: "In fact, the Company was suffering from a prolonged liquidity crisis, and had virtually exhausted its available credit line for a substantial portion of the Class Period–a sure sign that bankruptcy was an imminent threat." (AC, ¶ 29). The statement of the cause of action in Count I (AC, ¶ ¶ 477-482) makes no reference to Plaintiff's theory of loss causation. See Porter v. Conseco, Inc,, 2005 U.S. Dist. LEXIS 15466, *13-*14 (S.D. Ind. July 14, 2005) (Dura "makes clear that a plaintiff must give a defendant fair notice of his loss causation theory in the complaint"); see also D.E. & J. Ltd. P'ship v. Conaway, CA Nos. 03-2334 and 03-2417, 2005 U.S. App. LEXIS 11267, *16 (6th Cir. June 10, 2005), affirming dismissal of the complaint for failure to plead loss causation, in part because the plaintiff did not give fair notice of the relevant economic loss or the causal connection between the loss and the misrepresentation. On the other hand, the Amended Complaint contains no allegations which allow the Court to apportion Plaintiff's losses between the concealed and disclosed portions of the risk that materialized – in fact, even the magnitude of the loss is unclear.[68] See In re Gilead Sciences Sec. Litig., CA No. No. 03-4999 et al., 2006 U. S. Dist. LEXIS 32893, *12-*13 (N.D. Cal. May 12, 2006), referring to an earlier unpublished opinion in which the court had dismissed the third amended complaint because plaintiffs had inadequately pled loss causation in part because the court was

---

during [2001.]" In re Sawtek Inc. Sec. Litig., CA No. 03-294, 2005 U.S. Dist. LEXIS 39223 at *43 and n.5 (M.D. Fla. Oct. 6, 2005), noting that during 2001, the broad U.S. stock market declined 11.46%.

[68] Since the value of ITG stock was $4.77 per share at the time Plaintiff asserts effects of the Company's liquidity crisis began to materialize, it logically follows that any decrease between a purchase price greater than $4.77 per share and $4.77 would have been caused by other factors and not by materialization of the risks associated with lack of liquidity. Moreover, because there are absolutely no allegations as to the monetary losses incurred by members of the Class who purchased the unsecured notes, the Court cannot begin to allocate their losses between the alleged fraudulent and non-fraudulent causes of the decline in value.

"left to speculate as to what portion, if any, of [the] decrease should be attributed to the alleged

misconduct or whether the loss was caused by other factors."

While the Supreme Court in *Dura* assumed "at least for argument's sake," that neither the

Rules of Civil Procedure nor the securities statutes impose a heightened pleading standard on the

element of loss causation,

> it should not prove burdensome for a plaintiff who has suffered an economic loss
> to provide a defendant with some indication of the loss and causal connection that
> the plaintiff has in mind. At the same time, allowing a plaintiff to forgo giving any
> indication of the economic loss and proximate cause that the plaintiff has in mind
> would bring about the harm of the very sort the statutes seek to avoid.

*Dura*, 544 U.S. at 347.

Plaintiff has not argued in the alternative that a corrective disclosure occurred which alerted

the market to Defendants' fraud; in fact, he appears entirely to reject that argument. Accordingly,

the Court concludes that: (1) he has not satisfactorily established a materialization of the risk

argument as set out by courts which have recognized this as an alternate way of pleading loss

causation, and (2) he did not give Defendants fair notice of his economic loss and proximate cause

in the Amended Complaint. Therefore, failure to plead loss causation is yet another reason why

the Amended Complaint must be dismissed.


## IV.    COUNT II – VIOLATION OF SECTION 20(a) OF THE 1934 ACT

In Count II of the Amended Complaint, Plaintiff asserts that the Individual Defendants and

Carlyle are liable as "controlling persons" of the Company which violated the securities laws.

Specifically, he alleges:

> The Individual Defendants and the Carlyle Group, by virtue of their offices,
> directorships, stock ownership and specific acts were, at the time of the wrongs
> alleged herein and as set forth in Count I, controlling persons of [ITG] within the
> meaning of Section 20(a) of the 1934 Act. The Individual Defendants and the
> Carlyle Group had the power and influence and exercised the same to cause [ITG]
> to engage in the illegal conduct and practices complained of herein by causing the
> Company to disseminate the false and misleading information referred to above.

70

The Individual Defendants' positions made the Individual Defendants and the Carlyle Group privy to and provided them with actual knowledge of the material facts concealed from plaintiffs and the Class. By virtue of the conduct alleged herein, the Individual Defendants and the Carlyle Group are liable for the aforesaid wrongful conduct and are liable to plaintiff and the Class for damages suffered.

(AC, ¶¶ 485-486).

As noted in *Payne*, liability under Section 20(a) of the 1934 Act[69] is predicated on an underlying violation by a person or entity controlled by the defendant. *Payne*, 433 F. Supp.2d at 611-12. If no controlled person is liable, there can be no controlling person liability. *In re Alpharma*, 372 F.3d at 153. Because Plaintiff fails to successfully allege that the controlled entity, ITG, violated Section 10(b) or Rule 10b-5, his Section 20(a) claims against The Carlyle Group and the Individual Defendants must fail as well. *In re Alpharma*, *id.* Accordingly, the Court need not address the arguments raised by the parties in their supplemental briefs on this subject. (*See* Docket Nos. 59 and 62).

## V. CONCLUSION

Dismissal with prejudice is warranted in this case. The Amended Complaint, although only the second version, essentially duplicates the allegations made in three iterations of *Payne v. DeLuca* and the arguments offered by Plaintiff here are largely the same as those the Court rejected in that case. Plaintiff has failed to establish scienter by any Defendant, despite access to voluminous documents gleaned from ITG's bankruptcy proceedings. This case is based on the entirely speculative view that since the Company was forced to declare bankruptcy, there "must have been" fraudulent activity on someone's part. The allegations against the members of the

---

[69] In full, Section 20(a) provides: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. §78t(a).

Board of Directors are particularly weak and rely entirely on the unsupported speculation that they deliberately or recklessly ignored the Company's financial condition for more than four years. The failure to establish scienter on the part of any Defendant is sufficient alone to require dismissal.

One objective of the PSLRA is "to provide a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis." *GSC Partners*, 368 F.3d 228 at 246, *quoting In re NAHC Inc. Sec. Litig.*, 306 F.3d 1314, 1332 (3d Cir. 2002). As the Court of Appeals noted, "[t]his objective would be frustrated where there is a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced which would, if true, cure the defects in the pleadings under the heightened requirements of the PSLRA." *GSC Partners*, *id.* (internal quotation omitted.) Moreover, "the Third Circuit has made clear, that in actions filed under the PSLRA, leave to amend should not be granted in a fashion that would frustrate the heightened pleading requirements of the statute." *In re Bristol-Myers Squibb Sec. Litig.*, CA No. 00-1990, 2005 U.S. Dist. LEXIS 18448, *28 (D. N.J. Aug. 17, 2005), *citing Chubb*, 394 F.3d at 164. Therefore, the Amended Complaint will be dismissed with prejudice.

An appropriate Order follows.

Thomas M. Hardiman
United States District Judge